**CONTINENTAL CAN COMPANY, Inc.,**
Plaintiff (Appellee),

v.

**ANCHOR HOCKING GLASS CORPORA-
TION, Defendant (Appellant).**

No. 15354.

United States Court of Appeals
Seventh Circuit.

June 6, 1966.

As Clarified June 23, 1966.

James P. Hume, Granger Cook, Jr., Chicago, Ill., Jack D. Voss, Chicago, Ill., Norman N. Holland, New York City, of counsel, for appellant.

Fred S. Lockwood, Raymond L. Greist, John L. Alex, Chicago, Ill., William A. Dittmann, Chicago, Ill., of counsel, for appellee.

Before CASTLE, KILEY and SWY-GERT, Circuit Judges.

CASTLE, Circuit Judge.

Continental Can Company, Inc., plaintiff-appellee, the owner by assignment of

Zipper U. S. Patent No. 2,841,304,[1] relating to closure caps for hermetically sealing glass containers, brought this suit in the District Court charging Anchor Hocking Glass Corporation, defendant-appellant, with infringement of the patent[2] and breach of an implied contract in connection therewith. Following trial of the issues the District Court filed a memorandum of decision containing its findings of fact and conclusions of law holding all three claims of the patent valid and deliberately, wilfully and wantonly infringed by the defendant, and that no contract existed between the parties. The court entered a judgment order enjoining further infringement, providing for a reference of the cause to a master for an accounting of damages suffered by plaintiff and that plaintiff recover same together with its costs, and additionally awarding plaintiff its attorneys' fees and expenses with respect to the issues raised by defendant's challenge to the validity and infringement of the '304 patent.

The main contested issues presented by defendant's appeal are (1) whether the District Court erred in failing to find the Zipper U. S. Patent No. 2,841,304 invalid for "obviousness" under the standard for patentable invention prescribed by 35 U. S.C.A. § 103, and (2) whether the record supports the award of attorneys' fees and expenses made to the plaintiff.

■ Apart from its assertion of invalidity of the patent for "obviousness" the defendant, a competitor of plaintiff in the manufacture and sale of closure caps, does not contend on appeal that the court erred in finding infringement. Nor does it contend the claimed invention lacks the factors of "novelty" or "usefulness" required by 35 U.S.C.A. § 102. The commercial success enjoyed by plaintiff's caps which embody the combination of elements called for by the claims of the patent attests to the usefulness of the claimed invention. And, commercial success, although a secondary consideration, may in the light of the circumstances surrounding the origin of the subject matter have relevancy as indicia of non-obviousness. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545.

■ Section 103 of the Patent Act makes non-obviousness of the subject matter a condition for patentability. And, a determination of this condition lends itself to several basic factual inquiries. These include the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. Graham v. John Deere Company, supra. Therefore, insofar as the findings of the trial court upon which it predicates its conclusion of validity in resolving the issue of "obviousness" asserted by the defendant concern factual issues such as the use made of prior art and the nature of the improvement made over prior art, Rule 52(a) of the Federal Rules of Civil Procedure (28 U.S.C.A.) applies. The court heard the testimony of expert witnesses in connection with these matters. The scope of our review of such findings is limited to a determination of whether or not they are "clearly erroneous". Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143, 151–157; Minnesota Mining and Mfg. Co. v. Technical Tape Corp., 7 Cir., 309 F.2d 55, 57. If they find support in the evidence we are bound thereby and there remains but the question of whether or not the court applied the correct legal criteria in reaching the ultimate conclusion it did. Aerosol Research Company v. Scovill Manufacturing Co., 7 Cir., 334 F.2d 751, 753.

The '304 patent relates to metal closure caps for hermetically sealing wide mouth glass containers used primarily for food products. The cap which is the subject matter of the patent is of the top-seal

1. Referred to herein as the " '304" patent.

2. The complaint also charged defendant with infringement of U.S. Patent No. 2,-874,863. By stipulation plaintiff limited its claim of infringement to claims 3, 5, 9, 10, 15, 16, 23, 24, 25 and 26 of that patent. The court held such claims invalid. Plaintiff took no appeal.

variety. Like prior art disclosures it is an enamel-lined shallow metal shell, formed to provide a stacking panel, and employing around the perimeter of its underside an annular or ring-like gasket. When the cap is forced down onto the top of a glass container the rim or edge of the container presses into the gasket to form a seal therewith. In a cap with a stacking panel the metal forming the top surface is bent so as to form two levels, a large depressed flat circular section comprising the main portion of the area of the top of the cap, surrounded by a slightly higher flat narrow ring around the edge about the width of the usual gasket. The depressed flat circular space on the top of the cap accommodates the base of a jar of the same diameter so that it will not slide off, and thus permits the jars to be stacked for retail display or storage. The underside of the raised flat ring circumscribing the stacking panel affords a channel to receive a gasket. All of the above described elements are anticipated by prior art.

Each of the three claims [3] of the '304 patent is confined to the use of a vinyl-based plastisol gasket having a "relatively thin annular film-like anchoring portion" extending inwardly across and beyond the inclined annular shoulder which defines the stacking panel portion of the top of the cap. This anchoring portion is integrally connected with the relatively thicker portion of the gasket which fills the channel substantially flush with the inwardly adjoining undersurface of the top panel portion of the cap, and it is in firmly adherent contact with the top panel portion of the cap.

The record discloses that plastisol has several characteristics which make it desirable as a jar closure gasket material. The process involved in its use for such purpose is much simpler and less expensive than that involving rubber. Plastisol does not need to be preformed as does rubber. Plastisol can be flowed easily into the closure shell and then fluxed. It cures in a few minutes whereas rubber requires several hours. In addition, plastisol is clean appearing, non-toxic, compatible with many food products, and highly impervious to water or air. Rubber ring top-seal gaskets had been used in twist-off caps for containers of food products since the early 1950's. Consumers soon showed a preference for the twist-off caps over the side-seal type which required the use of a tool to pry them off and were usually bent out of shape in the process. Housewives wanted food product jars with caps which were removable without any opening tool and could be reused to close the jar once it was opened. And the industry desired a gasket material more satisfactory than rubber. Rubber was not sufficiently impervious to oxygen, water or other fluids, sometimes affected the taste of foods, and was difficult and expensive to use.

The record establishes that the attempt to utilize plastisol as a cap gasket material for hermetically sealed food product containers produced it own problem. In the latter part of 1952 or early part of 1953 the White Cap Company, which later became the White Cap Division of the plaintiff, began working on the production of a new cap employing plastisol as the material for the gasket. Plastisol was flowed or sprayed into the underside channel of the ordinary enamel-lined tinplate, stacking-panel top, twist-off top-seal cap of the prior art and then fluxed. The field tests of these caps by a food processor, made under commercial packing conditions, revealed an unexpected and serious defect. Heat and pressure conditions imposed on the caps in the course of processing and hermetically sealing the caps resulted in a loss of adhesion and lifting of the gasket. At the points where the gasket lifted it took with it the protective layer of enamel or

---

**3.** Claim 1 calls for an anchoring portion of "appreciable width"; Claim 2 specifies an anchoring portion having a width at least equal to the thickness of the portion of the gasket which fills the channel; and Claim 3 specifies an anchoring portion having a width at least equal to the radial width of the inclined portion of the annular shoulder of the channel.

lacquer covering the inside of the cap and exposed the metal to corrosion at such sites.

There is testimony of expert witnesses which supports the District Court's findings that the problem was one peculiar to the use of plastisol as the gasket material. Such testimony establishes that the plastisol attacks the enamel or lacquer in a debasing fashion. This debasement creates a problem when the heat and pressure applied in the sealing process causes the gasket to pull or lift from the cap, taking with it the coating on the tinplate and thus exposing the metal to corrosion. Rubber gaskets either adhered to the cap or if they became loose at any point they did not in so doing remove the lacquer or enamel from the metal and leave it bare to corrosion.

The record discloses that White Cap's employees, Charles N. Foster, a research engineer, and George Chaplin, head of the cap development department, attempted to solve the loss of adhesion problem by widening the gasket in an outward direction to more completely fill the channel around the cap's margin. This proved of some help but did not reduce the lifting at the inner edge of the gasket where the lifting was most serious because of exposure of the bared metal to the contents of the container, and therefore failed to solve the adhesion loss problem.

Donald H. Zipper, a research scientist with White Cap, was assigned the task of finding an enamel for use as a protective coating for the cap shell interiors which would give adequate adhesion between the plastisol gasket and the coating. Zipper employed a testing procedure whereby each enamel to be tested was painted on a flat piece of tinplate of the type used for the cap shell. Plastisol was poured on top of the enamel to form a strip resembling the gasket in thickness and then fluxed. The tinplate was bent at right angles to the strip, with the strip on the outside of the bend. The plastisol strip was slit at the edge of the bend and parallel thereto. The resulting specimen was immersed in water for one minute inter-

vals at increasing temperatures until a failure point was reached at which the plastisol, where slit, opened and separated from the metal. In the course of making these tests Zipper observed that there was a part of the plastisol which never lifted—namely, the thin portion at each edge of the strip where the plastisol because of its fluidity had spread out thinly before the fluxing had caused it to assume a relatively stable state. Zipper came to the conclusion that the reason for this was that the flexibility of the extremely thin edges of the strip caused them to stretch instead of pull loose when pressure was supplied, whereas the relatively thicker portions of the material had less flexibility and therefore pulled loose from the enameled surface of the tinplate when pressure was applied in a direction which tended to separate them from the metal.

Zipper applied this principle to solve the problem resulting from the lifting which had been encountered in the use of plastisol gaskets. Caps were constructed in which the plastistol annular gaskets were so formed that a film-like anchoring portion of appreciable width extended inwardly well beyond the shoulder of the channel. Tests revealed that the thin anchoring portion retained its adhesion even though the thick portion of the gasket within the channel lifted. The lifting of the thick portion was harmless because the film-like inner edge held firmly and prevented any seepage into the lifted area where the metal was exposed. The problem which had prevented the successful use of plastisol gaskets was solved and the means of its solution became the basis of the '304 patent granted to Zipper.

White Cap commenced commercially producing and selling plastisol gasketed top-seal lug caps incorporating the feature of Zipper's improvement sometime between the latter part of August and September 24, 1954. The patent was applied for on July 8, 1955, and issued July 1, 1958. The defendant began selling caps sometime between November 22, 1957 and January 1958 which incorpo-

rated the elements of the claims of the '304 patent. They were the first plastisol gasketed cap the defendant marketed. The defendant had spent approximately a year attempting to develop a satisfactory plastisol gasket. It had known of the plastisol material as early as 1947, and prior to 1950 a vendor had submitted its plastisol compounds and offered assistance to the defendant in utilizing it in caps. But neither the vendor, Dewey & Almy, the defendant, or White Cap, all highly skilled cap people, had produced an acceptable plastisol gasketed cap until the Zipper innovation solved the corrosion problem caused by the lifting and enamel removing characteristics of plastisol when so employed.

The defendant contends that, as a matter of law, the Zipper claims are invalid for "obviousness" under 35 U.S.C.A. § 103. In this connection the defendant points to (1) the record evidence relative to its commercial production and sale, more than three years prior to Zipper's development, of some 700,000 Gora-Lee type caps having an "overlap" gasket extending inwardly of the stacking panel radii or shoulder; (2) the prior art disclosures of Taliaferro U. S. Patents Nos. 1,488,567 and 1,616,518, neither of which were before the Patent Office; and (3) defendant argues that Zipper's contribution was merely to widen the plastisol gasket inwardly in the same manner as Foster and Chaplin previously had widened it outwardly.

The record shows the defendant's prior production of the Gora-Lee type cap was primarily of the side-seal variety. A molded rubber gasket was used in all of them. When a user complained that it was encountering a perforation problem occuring a slight distance inward from the stacking panel radii or shoulder the defendant adopted the user's suggestion that the gasket be widened inwardly to cover that area. This extended portion was thinner than the portion of the gasket lying within the channel at the outward side of the shoulder. But the record also establishes that when rubber is used as the gasket material it adheres at all points without any tendency to lift or remove the enamel or lacquer coating. The widening of the rubber gasket in defendant's Gora-Lee caps to cover a possible corrosion site located adjacent to the bend in the metal which forms the shoulder was not addressed to the problem the '304 patent solved. Nor did it suggest such solution. The Zipper patent solves a problem not present when rubber is used as the gasket material. Likewise, neither of the Taliaferro patents teach or suggest the use of a "thin annular film-like anchoring portion" of the gasket extending inwardly from the thicker channel-filling portion and reaching across and beyond the shoulder for an appreciable width for the purpose of overcoming the problem occasioned by the lifting and enamel removing propensity inherent in the use of plastisol as a gasket material in hermetically sealed caps.

The defendant seeks to invoke the patent law axiom that the mere substitution of some new material for that formerly used does not necessarily rise to the dignity of patentable invention even though it results in a superior article. Graham v. John Deere Company, supra; Florsheim v. Schilling, 137 U.S. 64, 76, 11 S.Ct. 20, 34 L.Ed. 574; Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683. But here much more than substitution is involved. It is evident from the record that the use of plastisol was desirable and its use appeared to be obvious. But in actual practice its use was not a success until Zipper discovered a means of overcoming the lifting and enamel removing problem inherent in the use of plastisol as the gasket material in a closure cap to be hermetically sealed and which had prevented its substitution for rubber. The '304 patent teaches not mere substitution but the use of a structure which enables a highly desirable substitution, which had not otherwise been attainable, to be made. And there is much more to the teachings of the patent than the work of Foster and Chaplin could have suggested. They had widened the thick in-channel gasket outwardly

only, and without thinning, to more nearly fill the channel and bring the gasket material approximately to the skirt or outer sidewall of the cap. This helped in avoiding movement or lift-off at the outer edge of the gasket, the less important site of difficulty, but did nothing to overcome the more severe and significant corrosion problem on the inside where the potential corrosion site created by the lifting exposed the bared metal to the contents of the jar. If a mere widening of the gasket inwardly in the manner in which Foster and Chaplin had widened it outwardly would have afforded a complete remedy to the problem encountered these research engineers, skilled in the art, no doubt would have done so. There was nothing in Foster and Chaplin's work which suggested the solution discovered by Zipper and which became the basis of the '304 patent.

From our examination and study of the record we are convinced that the critical factual findings upon which the trial court's determination of validity of the patent, over the defendant's asserted claim of "obviousness", rests find support in the expert testimony adduced. We perceive no basis for holding any of these factual findings clearly erroneous and, therefore, we must accord them the finality provided for by Rule 52(a). And, the District Court did not err in the legal criteria it applied to such findings in reaching the conclusion it did.

■ We conclude that the District Court's findings and conclusions that the claims of the '304 patent are valid and are infringed by the defendant's accused structures must be affirmed. In reaching this conclusion we have considered but find unpersuasive additional but peripheral contentions the defendant has made but which we will not extend this opinion to discuss.

We turn to consideration of the propriety of the award of attorneys' fees and expenses to the plaintiff. This Court has had occasion to observe that the allowance of attorney's fees must find support in exceptional circumstances justifying the award. Binks Manufacturing Company v. Ransburg Electro-Coating Corporation, 7 Cir., 281 F.2d 252, 260; Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 7 Cir., 238 F.2d 867, 874. In this connection, 35 U.S.C.A. § 285, which authorizes allowance of attorneys' fees to the prevailing party in a patent action, restricts such allowances to "exceptional cases".

The record discloses, and the District Court found, that defendant ceased infringement in September 1958 after plaintiff called attention to its patent and requested assurance that defendant would not make use of features covered by the patent. In January 1963 the defendant resumed the manufacture and sale of infringing caps and abandoned a non-infringing plastisol gasketed cap it had marketed in the interim in which an added organasol coating had been used on the metal to provide corrosion resistance and adhesion to the plastisol gasket. The interim cap had proved more expensive to manufacture and had created a nuisance problem in the plant due to fumes produced in its manufacture. But the record also discloses that when the plaintiff first raised the question of infringement in August of 1958 the defendant referred the matter to its patent counsel and on September 10, 1958, informed the plaintiff by letter that defendant's patent counsel had advised that the patent was invalid. In the same letter defendant clearly claimed and asserted the rights to manufacture and sell its accused structures and declared that by introducing its new cap (the interim structure which was later abandoned) it was not "acquiescing in the validity or scope of your patent No. 2,841,304".

Although the District Court characterizes the infringement as "deliberate and wilful" and "wilful and wanton" and categorizes the defendant's trial contentions as "so obviously lacking in merit that I cannot conclude the defendant had any good faith belief that the patent was invalid" it does so in an exhaustive and detailed memorandum of decision after a trial of the issues had served as the occasion for eliciting of the expert testi-

mony supporting the critical factual findings upon which in final analysis its conclusion that the patent is valid rests. If defendant's "foresight had been as good as its hindsight, it no doubt would have acted differently". Union Carbide Corporation v. Graver Tank & Mfg. Co., 7 Cir., 282 F.2d 653, 663.

 Defendant had been advised by counsel that the patent was invalid. That the defendant questioned the validity of the patent and asserted the rights to manufacture and sell its accused structures does not serve to constitute the infringement as wilful or wanton. Aerosol Research Company v. Scovill Manufacturing Co., 7 Cir., 334 F.2d 751, 758. The situation here is somewhat analogous to that which confronted Judge Major in Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 208 F.2d 1, 5, and led to his apt observation that:

> "While we have little, if any, difficulty in accepting the findings and conclusions of the District Court on the issue of validity and infringement, we think a more serious question is presented on the issue as to whether such infringement was wilful and wanton. On this issue, the burden was not upon the defendant Hoffman to prove exoneration but upon the plaintiffs to substantiate the charge. It has been held that a bona fide and reasonable belief that a patent was invalid removes the infringement from the class designated as wanton and wilful. Packwood v. Briggs & Stratton Corp., D.C., 99 F. Supp. 803, 808; Pennington Engineering Co. v. Houde Engineering Corp., D.C., 43 F.Supp. 698, 699, 707, affirmed 2 Cir., 136 F.2d 210. See also Associated Plastics Companies v. Gits Molding Corp., 7 Cir., 182 F.2d 1000, 1006."

Defendant's action in seeking the advice of counsel when first accused of infringement is a factor which warrants an inference of good faith. Union Carbide Corporation v. Graver Tank & Mfg. Co., 7 Cir., 282 F.2d 653, 663.

 In our judgment the specific findings made by the District Court do not support a conclusion that this is an "exceptional case" justifying the award of attorneys' fees. And, aside from the usual items embraced in the allowance of costs we are aware of no authority for the award of other "expenses". Union Carbide Corporation v. Graver Tank & Mfg. Co., 7 Cir., 282 F.2d 653, 675.

The judgment order of the District Court is affirmed, except insofar as it finds that the infringement by the defendant was "deliberately, wilfully and wantonly" and except insofar as it awards plaintiff its expenses and attorneys' fees. The phrase "deliberately, wilfully and wantonly" is vacated from paragraph 8 of the judgment order and the award of expenses and attorneys' fees is vacated from paragraph 14 of the judgment order. The judgment is modified accordingly.

Costs on appeal are awarded the plaintiff-appellee.

Affirmed as modified.