**HADCO PRODUCTS, INC.**

v.

**LIGHTING CORPORATION OF AMERICA, INC.**

**Civ. A. No. 39056.**

United States District Court, E. D. Pennsylvania.

April 2, 1970.

Robert B. Washburn, and John J. Mackiewicz, Philadelphia, Pa., for plaintiff.

Arthur H. Seidel, Philadelphia, Pa., for defendant.

## OPINION

BODY, District Judge.

This is an action for the infringement of Design Patent No. 199,143, applied for by Howard A. Daum on April 26, 1963 and issued to him on September 15, 1964.[1] The design involved is directed to a "Tudor" lighting fixture appropriate for both indoor and outdoor use. Plaintiff seeks treble damages under 35 U.S. C. § 284 and an accounting under § 289 of that title. It also seeks injunctive relief and the award of reasonable attorney fees.

The defendant by way of counterclaim seeks a declaratory judgment that the patent is invalid. It asserts as defenses and in support of such a declaration (1) obviousness, (2) insufficient disclosure, (3) indefiniteness, (4) new matter, (5) double patenting, (6) non-infringement, (7) the Muncie Gear doctrine and (8) plaintiff's failure to file a supplemental oath. The defendant also seeks the award of reasonable attorney fees in the event it is victorious.

The design in question is suggestive of old English architecture and is embodied in a lighting fixture comprising a base, a cage, a roof, a vent cap, and a finial. The base is round in shape, presenting in profile a smooth curve which is relatively sharp at the top and relatively flat at the bottom. The cage forms a regular hexagon with ribs inclining upwardly and outwardly from each corner of the bottom. The roof has an outwardly flared bottom portion with horizontally projecting eaves which overhang the cage and terminate in sinusoidally curved edges. The sides of the roof correspond in number to the sides of the cage, each presenting in profile a smooth curve relatively flat at the top and relatively sharp at the bottom. The upper surfaces of the eaves adjacent to the outer edges thereof are alternately raised and depressed to form a series of triangular accents separated by U-shaped indentations known as scallops. The design also includes a series of six simulated ventilators of triangular configuration, each smoothly curved in profile and set out from the panels of the roof. The roof has superimposed thereon a vent cap with an outwardly flared bottom portion. It too corresponds in number of sides to the cage and has superimposed upon it a pointed finial having six sides and an outwardly flared lower portion.

As usual, plaintiff claims the ornamental design for a lighting fixture "substantially as shown and described."

## SUBSTANTIVE DEFENSES

*Obviousness*

Since the defendant does not question the novelty, originality or ornamentality of the patent in suit,[2] we may focus immediately on the issue of obviousness. The Patent Act of 1952 provides for evaluation of the inventive element of a patent as follows:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at

1. By virtue of assignments from Mr. Daum dated July 13, 1965 and October 12, 1965, Hadco is the owner of the patent in suit, including all rights of recovery for infringement damages.

2. See 35 U.S.C. § 171.

the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * * " 35 U.S.C. § 103.

In addition, the Supreme Court has directed that our inquiry concerning obviousness take the following form:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

The defendant has offered as prior art eleven primary items and fourteen secondary items. We deem it necessary to consider only items 3, 6, 7, 16, 19 and 21(a) in order to define the scope and content of the prior art.

Figure No. 1421 in item #3 appears on page 26 of the 1946 Progress[3] Catalog #40. It is a wall lighting fixture having an hexagonally shaped cage with ribs inclining upwardly and outwardly from the bottom thereof. The ribs themselves are ornamented, and additional ornamental metalwork occupies the horizontal space between the ribs at their upper extremities and extends down over a portion of the intervening vertical panes of glass. This fixture also has a six-sided roof with each panel thereof flaring downwardly and outwardly in a straight line from the top and exhibiting a simulated ventilator set out from its upper surface.

Item #6 is an enlargement of figure No. 469 in item #5. It appears on page 17 of Herwig Catalog #60 and is also a wall lighting fixture. It would seem to have a four-sided cage with ribs at each corner thereof, inclining upwardly and outwardly from the bottom. The fixture

is characterized by a round conical roof which flares downwardly and outwardly from the top, presenting a flat and somewhat uneven curve in profile. The lower portion of the roof overhangs the cage and terminates in a wavily curved edge.

Item #7 is a photograph of a lighting fixture affixed to the St. James Lutheran Church in Philadelphia. This fixture exhibits a straight, vertical omni-sided cage with ribs at its corners and an additional such rib located between the corner ribs for each side. Some of the intermediate ribs extend up through the lower portion of the overhanging roof and terminate in fleur-de-lis ornaments. Further ornamentation of the intermediate ribs is achieved by varying their predominantly rectangular configuration with a twisted middle section. A thin twisted length of metal horizontally encircles the cage at its upper and lower ends. A cone-shaped roof, corresponding in number of sides to the cage, flares downwardly and outwardly, its lower portion overhanging the cage and terminating in decoratively patterned edges. Horizontally encircling the cage below the overhanging portion of the roof is a vertically depending, ornamented metal skirt, while set out from at least one side of the roof is a simulated ventilator. Superimposed upon and overhanging the upper portion of the roof is a vent cap corresponding in miniature to the design of the roof, except for the absence of simulated ventilators. An ornate fleur-de-lis finial styled in the motif of the intermediate ribs is in turn mounted upon the vent cap.

Item #16 incorporates two views of a lighting fixture sold by the plaintiff in 1961. It too has an elongated, omni-sided cage with straight vertical ribs at each corner. As with the lighting fixture affixed to St. James Lutheran Church, it has a roof which corresponds in number of sides to the cage and de-

3. Progress Manufacturing Company, Inc. was a Pennsylvania corporation which existed until April 25, 1966. On that date a certificate of amendment was issued changing the name of that corporation to Lighting Corporation of America, the defendant herein.

clines downwardly and outwardly in a straight line until reaching the top of the cage and terminating in slightly scalloped edges. This Hadco fixture has a vent cap superimposed upon and corresponding in miniature to the design of the roof.

Item #19, and more specifically figures 066 and 067 therein, show variations of a lighting fixture having a multi-sided conical roof. Each side descends downwardly and outwardly in a straight line, terminating in sinusodially curved edges. Alternate sides exhibit simulated ventilators set out from their respective planes.

Finally, item #21(a) constitutes an enlargement of a photograph taken from a metalwork scrapbook. It shows a lighting fixture having a small multi-sided roof which exhibits a gradual bell-shaped curve downward and outward from its top. Set out from each panel of the roof is a simulated ventilator, purporting to follow ever so slightly the curve of the roof.

Summarizing, then, the level of ordinary skill in the art included the ability to design different lighting fixtures of somewhat varying styles having as their component elements a base, a cage, a roof, a vent cap, and a finial. Hexagonal cages of the type employed by Daum were known and commonly employed by other lighting fixture designers a number of years prior to the filing of his application for the patent in suit. Also, roofs corresponding in number of sides to the cage and exhibiting simulated ventilators set out from each panel thereof were a known quantity in lighting fixture design more than a year before the filing of this patent application. It is further true that such roofs were often conical in shape. Moreover, vent caps were commonly superimposed on the roofs of lighting fixtures, paralleling them in some aspects of design. Lastly, the devices of a finial and base were routinely used to complete the design and give it a sense of balance.

In contrast, however, there are many characteristics of the patent in suit which set it apart from the prior art and which, when taken together, make it nonobvious to a person of ordinary skill in the art.

Recently the Supreme Court was called upon to interpret the statutory test for nonobviousness in a series of non-design cases.[4] Much of what was said in those cases is difficult to apply in design cases because of the inherent differences between design and non-design patents.[5] The requirement of advancement, present in the constitutional standard of patentability,[6] seems to have far less practical application in design cases. Moreover, if the Constitution requires that a patent advance or add to the sum of useful knowledge, how can any design patent be constitutional? For, how can a design add to the sum of useful knowledge when a disclosure is merely an artist's view of the device and the patent protection runs only to the ornamental features of the article and

---

4. Graham v. John Deere Co., supra; United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

5. See In re Laverne, 356 F.2d 1003, 53 CCPA 1158 (1966) and In re Faustmann, 155 F.2d 388, 33 CCPA 1065 (1946).

6. See Graham v. John Deere Co., supra, where the Supreme Court said: "This qualified authority, (granted by Art. I, § 8, cl. 8), unlike the power often exercised in the sixteenth and seventeenth centuries by the English Crown, is limited to the promotion of *advances* in the 'useful arts.'" (Emphasis added.) "Nor may (Congress) * * * enlarge the patent monopoly without regard to the innovation, *advancement* or social benefit gained thereby." (Emphasis added.) "Innovation, *advancement*, and *things which add to the sum of useful knowledge* are inherent requisites in a patent system which by constitutional command must 'promote the Progress of * * * useful Arts.'" (Emphasis added.)

not the article itself?[7] On the other hand, if merely a change in design is thought to satisfy the requirement of adding to the sum of useful knowledge, then the only test of patentability in a design case is novelty. Some writers have suggested as much.[8] In addition, the frame of reference with respect to the issue of obviousness in mechanical patent cases is utility, a concept admitting of essentially one definition. This is so because it is defined in terms of the common needs of the members of society. On the other hand, ornamentation or aesthetic appeal, the frame of reference in design patent cases, is largely a matter of personal taste which varies from individual to individual. Thus, one's feelings and conclusions about a design are to a considerable extent subjective.

Along this line, the overall proportions and contour of the Daum patent provide a sharp contrast to both the "squatty" and "elongated" designs included in the prior art.[9] In addition, the former conveys a subtle sense of simplicity and gracefulness. Such is lacking in the prior art which is characterized, for the most part, by a look of formality and austerity quite foreign to the Daum design.[10]

Moreover, the appearance of grace and simplicity is heightened by the fact that the simulated ventilators in the Daum patent follow the curve of the roof in profile.

Another way in which the patent in suit differs markedly from the prior art is in its adaptability to different geographical and environmental settings. It has found use, for example, both indoors and outdoors in ranch houses, motels, hotels, restaurants, ski lodges, shopping centers, youth centers, churches and fraternity houses, as well as numerous types of commercial and privately owned residential structures, including houses of both colonial and contemporary architecture. It has been applied to posts in front of houses, to walls and over doorways by means of supporting brackets and pendant chains, and to ceiling fixtures of a large variety, including circular bands and the like.[11] The defendant, on the other hand, made no attempt to show that any item of the prior art is or was similarly adaptable. On the contrary, it indicated through its witnesses that such designs were custom-created. This difference between the Daum patent and the prior art constitutes the type of advancement or promotion of the useful arts which the Supreme Court found implicit in the constitutional standard of patentability.

Significant differences of a more specific nature exist between the patent in suit and the prior art. The smooth curve of its finial and vent cap, and especially of its roof, combine to produce in the Daum patent a "Christmas tree" effect not found in the prior art.[12] In addition, the sinusodially curved edges of the Daum roof, integrated with the triangular accents and scallops on the upper surfaces of the eaves, create a visual impression which is substantially different from and unanticipated by any combination of items of the prior art.[13]

The nonobviousness of the Daum patent over the prior art is indicated in still another way. Using the directory of "Lighting" magazine as a guide, the defendant began writing to the leading

7. See Note, The 1966 Patent Cases: Creation of a Constitutional Standard, 54 Geo. L.J. 1320 (1966).

8. Note, Design Protection—Time to Replace the Design Patent, 51 Minn.L.R. 942 (1967); In Re Laverne, supra.

9. Df. Ex. #210, items 4–7, 10–16, 21, 21 (a).

10. See Df. Ex. #210, items 3, 4, 7–19, 21–22.

11. See Pf. Ex. #121(a)–121(o).

12. Item 7 of Df. Ex. #210, the St. James fixture, does not present such an appearance because of the shape of its finial, the presence of the fleur-de-lis ornaments extending up through its roof and the length of its cage in relation to the size of its roof and vent cap. (See Pf. Ex. #128, pp. 42–44).

13. See Df. Ex. #210, items 5–7, 16, 19.

manufacturers of lighting fixtures with the exception of Hadco.[14] It sent them a copy of the Daum patent and inquired as to whether they knew of the sale or advertising of a similar fixture. As may be seen from the replies,[15] the addressees produced nothing in the way of anticipatory prior art, and many stated that they knew of no such fixture prior to the Daum patent. Indeed, one of the manufacturers wrote to the plaintiff as well as the defendant, commenting upon the latter's reputation as a copier of the designs of others.[16]

The Supreme Court recently pointed out that at least insofar as mechanical patents are concerned, such considerations as commercial success and long felt but unsolved need may have relevancy to the issue of nonobviousness but are only secondarily important as individual criteria.[17] However, since one's evaluation of a design is in some measure the product of subjectivity, it may be that these considerations take on added weight as indicia of nonobviousness when design patents are involved.[18] In any event, we hold that the facts previously recited establish that the patent in suit teaches something of significance not previously disclosed.[19] Upon that basis we conclude that the following facts, insofar as they relate to such factors as commercial success and long felt need, are relevant to and supportive of our determination of nonobviousness.[20]

From the time it was placed on the market, the patent in suit gave evidence of satisfying something that was apparently needed in the industry. Surprisingly enough, although the "Tudor" ex-

hibited a traditional old English appearance, it proved suitable for use in many different geographic and environmental settings. Sales data prepared by the plaintiff[21] show that the "Tudor" became so popular with the purchasing public that in a short time it outstripped all other lighting fixtures made by Hadco. Sales of the "Tudor" continued upwardly in increasing amounts to and through 1968–1969. In fact, by fiscal year 1967–1968, sales of that fixture adapted for electric lighting accounted for 18% of all catalog electric sales and 13% of the total electric sales of Hadco. The cumulative total of such sales in a six year period amounted to 29,805 units.[22]

Shortly after the Hadco "Tudor" came on the market, customers of the defendant called upon it to add a similar fixture to its line. With the use of an actual Hadco fixture, the defendant designed and introduced into its line the fixtures alleged to infringe. The amazing similarity in detail between the plaintiff's and defendant's fixtures attests to the substantial impact of the Daum design upon the industry.[23]

Notwithstanding the limitation of plaintiff's design by the defendant and others, and the further fact that the fixtures here alleged to infringe have enjoyed unusual success,[24] sales of the Hadco "Tudor" have continued to rise. This is so even though the accused fixtures are sold at lower prices than are the Hadco fixtures[25] and sometimes in the same stores or through the same distributors.

14. Pf. Ex #26(a)–26(y).

15. Pf. Ex. #27(a)–27(h).

16. Pf. Ex. #148; see also N.T. 268–279.

17. Graham v. John Deere Co., supra, at 17–18, 86 S.Ct. 684.

18. Cf. Boyer, Commercial Success as Evidence of Patentability, 37 Ford.L.R. 573 (1969).

19. Continental Can Company v. Crown Cork & Seal Company, 415 F.2d 601 (3d Cir. 1969).

20. United States v. Adams, supra, note 6; Jones Knitting Corporation v. Morgan, 361 F.2d 451 (3d Cir. 1966).

21. Pf. Ex. #126(a)–126(f).

22. N.T. 655–665.

23. As further evidence of this industry-wide impact, see Pf. Ex. #123–124 pertaining to Hadco Aluminum Products Co. v. Frank Dini Co., Civil No. 1112–65 (D.N.J.) wherein a consent judgment was entered in plaintiff's favor in 1966.

24. Pf. Ex. #140.

25. See Pf. Ex. # 127(a)–127(d).

From time to time courts have discounted the importance of such considerations as commercial success in connection with the inventive element of a patent. More often than not this is because they have suspected that factors other than the worth or merit of the patent produced them.[26] Such is not the situation with the patent in suit. There is no evidence that the commercial success enjoyed by the Hadco "Tudor" was due to anything other than the inherent appeal of the design there embodied. This conclusion is amply supported by the fact that Hadco spent comparatively small sums in advertising the same. The total amount of money spent in promoting the "Tudor", including monies spent for advertising, printing of brochures and catalogs, trade shows, newspaper advertisements and the like during the years 1962 through 1966 was $12,234.00.[27]

One final question concerning nonobviousness must be considered. The defendant asserts that the standards in this area are stricter for combination patents, such as the one in suit. It further contends that these standards have not been met here. In support of its first contention it cites language to the effect that

"* * * the standards are, if anything, stricter for combinations of design elements." Rains v. Niaqua, Inc., 406 F.2d 275, 279 (2d Cir. 1969).

It should be noted in passing that the *Rains* court did not specifically hold that stricter standards exist for combination patents. The above language was merely responsive to the admonition of the Supreme Court that reviewing bodies "scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). This Court has heeded that admonition and considers its holding of nonobviousness consistent therewith.[28]

## TECHNICAL DEFENSES

*Indefiniteness and Insufficient Disclosure*

The defendant makes a three-pronged attack upon the definiteness of the patent drawings in suit and the sufficiency of their disclosure. It contends that the Hadco patent is invalid because 35 U.S. C. § 112, Patent Office Rule 152, and § 1503.02 of the Manual of Patent Examining Procedure have been violated.[29]

---

26. See McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800 (1876).

27. Df. Interrog. #31 and Pf. Answer thereto.

28. We also consider our holding to be consistent with the principles enunciated in Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., supra, note 6, the latest pronouncement by the Supreme Court in the area of combination patents.

29. 35 U.S.C. § 112 provides in pertinent part: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

Patent Office Rule 152 states: "The design must be represented by a drawing made in conformity with the rules laid down for drawings of mechanical inventions and must contain a sufficient number of views to constitute a complete disclosure of the appearance of the article. Appropriate surface shading must be used to show the character or contour of the surfaces represented."

Section 1503.02 of the Manual of Patent Examining Procedure reads in part: "The necessity for good drawings in a design application cannot be overemphasized. As the drawing constitutes substantially the whole disclosure of the design, it is of utmost importance that it be so well executed both as to clarity of showing and completeness that nothing regarding the shape, configuration and surface ornamentation of the article sought to be patented is left to conjecture."

■ An initial question arises as to the force and effect of the Patent Office Rules and the Manual of Patent Examining Procedure. The former have been held to have the force and effect of law to the extent they are not inconsistent with the express provisions of the Patent Statute.[30] The latter, on the other hand, has been characterized as follows:

"This manual is not provided for expressly in the statutes, but is primarily a set of instructions to the examining corps of the Patent Office from the Commissioner acting in his supervisory capacity." In re Kaghan, 387 F.2d 398, 401 (C.C.P.A. 1967).

It is thus apparent that the Manual can rise no higher in status than the Patent Office Rules. The question of its exact force and effect need not be answered, however, since for present purposes we will accord both provisions equal status.

■ It seems apparent from their content that both Rule 152 and Section 1503.02 of the Manual were intended as extensions of the requirement found in Section 112 of the Patent Act. By implication, therefore, they employ the same frame of reference as that found in Section 112—namely, a person skilled in the pertinent art. Consequently, we hold that Rule 152, as construed, is a valid and effective regulatory provision under 35 U.S.C. § 6. For the purpose of this inquiry we will assume the same concerning Section 1503.02 of the Manual.

■■ We turn now to the question of definiteness and sufficiency of disclosure. It has been held in connection therewith that:

" ' * * * plaintiff must stand on his patent as issued; its meaning, intended significance, and asserted scope must be primarily learned from the four corners of the document as it stands * * *.' Whiting Mfg. Co. v. Alvin Silver Co., Inc., 283 F. 75, 80 (2 Cir. 1922)." Philco Corp. v. Admiral Corp., 199 F.Supp. 797, 801 (D.Del. 1961).

The defendant points out numerous mechanical errors and various inconsistencies between figures #1 and #2 of the drawings as issued. Upon that basis it asserts that the design is indefinite and insufficiently disclosed. The Court has carefully reviewed the evidence and has studied each alleged defect cited to it. It thereupon concludes that the errors and inconsistencies in the drawings as issued are inconsequential and do not, either singularly or in toto, constitute a violation of either the statutory or regulatory provisions. Bearing in mind that definiteness and sufficiency of disclosure are to be determined with respect to a person skilled in the art, it must be observed that the defendant offered no expert testimony in this area. Mr. Stith, its lighting fixture designer, was not questioned on the subject, and Mr. Fiddler, a patent attorney and former examiner in the Patent Office, was not a person skilled in the art of designing lighting fixtures.[31] The plaintiff, on the other hand, produced Mr. Yellin, an architect and an experienced designer of about five hundred lighting fixtures.[32] Upon direct examination he testified that the errors and inconsistencies cited by the defendant would present no problem as far as duplication and use of the design in suit are concerned.[33] Moreover, his testimony withstood vigorous cross-examination during which he consistently maintained the view that the

---

30. In re Rubinfield, 270 F.2d 391, 47 CCPA 701 (1959); Sperry Rand Corp. v. Bell Telephone Laboratories, Inc., 171 F.Supp. 343 (S.D.N.Y.1959); Gearon v. United States, 121 F.Supp. 652, 129 Ct. Cl. 315 (1954).

31. Mr. Fiddler stated that he had not worked in the Design Division of the Patent Office. (N.T. 1779–1780) Although he did testify to having filed several hundred design patent applications (N.T. 1646–1647), this does not result in his bringing to the evaluation of a design the creative and aesthetic sense of an ordinary designer of lighting fixtures.

32. N.T. 528–531, 548.

33. N.T. 626–627.

drawings enable even an average designer of lighting fixtures to make and use the design in suit without conjecture.[34] That testimony is strong evidence of compliance with the statutory and regulatory provisions and it adequately supports our holding of no violation.

### New Matter and Supplemental Oath

The next asserted ground of invalidity is that the scope of the patent was broadened by the insertion of amendatory new matter in the original application, unaccompanied by a supplemental oath.[35]

In analyzing this contention it is important to bear in mind that considerable weight must be given to the patent examiner's decision on this point. Courts have stated that the action of the Patent Office in permitting an amendment constitutes an implicit determination that no new matter is included therein. Such a determination, it is said, is entitled to special weight and should not be disturbed unless clearly erroneous. Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1 (E.D.Pa.1958), aff'd 268 F. 2d 395 (3d Cir. 1959), cert. denied 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959); Technicon Instruments Corp. v. Coleman Instruments Corp., 385 F.2d 391 (7th Cir. 1967); Aerosol Research Co. v. Scovill Mfg. Co., 334 F.2d 751 (7th Cir. 1964); Helms Products v. Lake Shore Mfg. Co., 227 F.2d 677 (7th Cir. 1955). It must be noted that the reason underlying this rule is clear and quite different from that giving rise to the general statutory presumption of a patent's validity.[36] Concerning the latter it has been noted that the considerations taken into account by the Patent Office, and the vantage point from which it approaches the issue of validity, are often different from those of a court in an infringement suit. For this reason, the force of the general statutory presumption of validity is weakened considerably. Blumcraft of Pittsburgh v. Citizens & Southern Nat. Bank, 407 F.2d 557 (4th Cir. 1969), cert. denied 395 U.S. 961, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969); Howe v. General Motors Corp., 401 F.2d 73 (7th Cir. 1968), cert. denied 394 U.S. 919, 89 S.Ct. 1192, 22 L.Ed.2d 452 (1969); Schmidinger v. Welsh, 383 F.2d 455 (3d Cir. 1967). On the other hand, the approach to the issue of new matter is the same for both the patent examiner and the court. Thus increased weight is accorded the former's determination in this regard.

Moreover, it is clear that the patent examiner in the case at bar was keenly aware of the question of new matter and made a definite determination that none was included in the amendments he accepted.[37]

That brings us to the question of whether or not the action of the Patent Office was clearly erroneous. We believe it was not. It is undisputed that several changes were made to the drawings as filed during the course of prosecution.[38] The defendant contends, however, that these changes resulted in such a drastic alteration of the original design that a completely new one was created. With this the Court cannot agree. Section 132 and Rule 118 prohibit the amendment of the original application in such a way as to broaden the scope of the patent. Reeves Bros., Inc. v. United States Laminating Corp., 282 F.Supp. 118, 130 (E.D.N.Y.1968). On the other hand, drawings and specifications may be amended to conform to one another. In re Heinle, 342 F.2d 1001, 52 CCPA 1164 (1965). They may also be amended for purposes of clarity and definiteness, Technicon Instruments Corp. v. Coleman Instruments Corp., supra; Helms Products v. Lake Shore Mfg. Co., supra; Reeves Bros., Inc. v. United States Laminating Corp., supra, or to add a claim concerning something

---

34. N.T. 635–640.

35. See 35 U.S.C. § 132; Patent Office Rules 118 and 67(a).

36. 35 U.S.C. § 282.

37. See Df. Ex. #40, pp. 5, 14, 18.

38. Df. Ex. #40.

which is fairly deducible from the original application. Hobbs v. Beach, 180 U. S. 383, 21 S.Ct. 409, 45 L.Ed. 586 (1901); Preformed Line Products Co. v. Fanner Manufacturing Co., 225 F.Supp. 762 (N.D.Ohio 1962), aff'd 328 F.2d 265 (6th Cir. 1964), cert. denied 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964); Drumhead Company of America v. Hammond, 18 F.Supp. 734 (W.D.Pa.1936), aff'd 89 F.2d 241 (3d Cir. 1937).

■ In the present case it seems clear that all the amendments were made for the sole purpose of achieving clarity and internal consistency. Moreover, without exception they were made during the initial prosecution of the patent[39] and at the request of the patent examiner who closely scrutinized them with regard to new matter. Under these circumstances we find that the latter's determination was not clearly erroneous and we therefore adopt it.

■ Further, it was unnecessary for the applicant to file a supplemental oath since no new matter was added and no amendment was made to the original claim. Aerosol Research Co. v. Scovill Mfg. Co., supra.

*Double Patenting*

Defendant's next attack upon the validity of the patent in suit is based on the assertion that it violates the rule against double patenting. While there are many reasons for applying this rule,[40] the primary one here advanced by the defendant concerns the avoidance of a multiplicity of patents for a single invention.

■ Defendant argues that Design Patents Nos. 199,142 and 199,143, both of which issued to Howard A. Daum on September 15, 1964, involve the same creative design. Since it is well settled that only one patent may issue for a single invention, Miller v. Eagle Mfg. Co., 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894); Underwood v. Gerber, 149 U.S. 224, 13 S.Ct. 854, 37 L.Ed. 710 (1893); In re Siu, 222 F.2d 267, 42 CCPA 864 (1955), defendant reasons that the patent in suit (No. 199,143) is necessarily invalid. The fallacy in this argument is that the two patents are not directed to the same design. The "Tudor" design (No. 199,143) was conceived prior to the "Camelot" design (No. 199,142). It is much taller in relation to its width and presents to the eye a radically different outline than does the "Camelot." In addition, the "Tudor" has straight ribs and an hexagonal roof, whereas the corresponding elements of the "Camelot" are curved and conical respectively. The ornamentation at the roof edges is entirely different in the two designs, as are the number and position of the simulated ventilators. The vent caps and finials in the two designs are also different in configuration. In the "Camelot" design there is a cylindrical roof section beneath the vent cap which has no counterpart in the "Tudor". Finally, sales figures clearly show public opinion to be that the "Tudor" and "Camelot" involve separate and distinct designs.[41]

In a related argument the defendant asserts that even if the patents are not directed to the same design, the "Tudor" design is not patentably distinct from the "Camelot", and it therefore violates the rule against double patenting. It is true that the prohibition against multiple patents for a single invention has been extended to apply to designs which are merely colorable variations of one another. In re Robeson, 331 F.2d 610, 615, 51 CCPA 1271 (1964). However, the same facts which demonstrate that the patents in question are not directed to the same design, foreclose the conten-

39. See Hestonville, M. & F. Pass. Ry. Co. McDuffee, 185 F. 798, 802, 109 CCA 606 (3d Cir. 1910).

40. See In Re Robeson, 331 F.2d 610, 615, 51 CCPA 1271 (1964).

41. The "Tudor" has accounted for a substantial percentage of Hadco's total sales. Sales of the "Camelot", on the other hand, have been practically insignificant, amounting to less than 1% of the "Tudor" sales. (N.T. 693–694, 770–771).

tion that they are mere colorable variations of one another. Moreover, patents which display a greater degree of dissimilarity do not fall within the purview of this branch of the rule against double patenting.

Defendant's related argument is relevant, however, to that branch of the rule which is based upon the objection to the extension of the monopoly. Patents directed to distinctly different but obvious designs violate the rule against double patenting unless they expire on the same day. In re Robeson, supra. On the other hand, patents involving designs which are patentably distinct do not violate the rule, regardless of their expiration date. Continental Can Company v. Crown Cork & Seal Co., 281 F.Supp. 474, 480 (E.D.Pa.1967), rev'd on other grounds, 415 F.2d 601 (3d Cir. 1969). In the instant case the patents terminate on the same day. Consequently we need not inquire whether the designs involved are patentably distinct, for in any event defendant's argument cannot prevail.

Liberally construing defendant's contentions, we find them to include the additional argument that Mr. Daum's activities in connection with the filing of the patent applications here in question were carried out with the intent to mislead the Patent Office or to conceal information from it. Suffice it to say that the evidence does not support such an interpretation of his actions, and we will refuse to sustain the defense of double patenting on that basis.

## Muncie Gear Doctrine

Howard Daum filed his application for the patent in suit on April 25, 1963, less than a year after the first "Tudor" lantern was sold on June 26, 1962. He subsequently amended his application for the first time on March 10, 1964. The defendant asserts that the collective effect of all the amendments made to Daum's application was to alter both its specification and claim, thereby rendering the design ineligible for patent protection.

Section 102 of Title 35, U.S.C., provides in part:

"a person shall be entitled to a patent unless—

(b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

The application date referred to in the statute is normally the date on which the original application was filed. Under the Muncie Gear doctrine,[42] however, applications are sometimes viewed with respect to late or altered claims as if filed when the claims are presented to the Patent Office. Such a view subjects them to any statutory bar then applicable.

The Muncie Gear doctrine is not applicable to this case because of our finding that the claim was never changed and only minor alterations were made in the drawings for the purpose of consistency and clarity.

## Non-infringement

Plaintiff asserts that fixtures P-5407,[43] P-5507,[44] P-5417,[45] P-5608 [46] and P-5607[47] of the defendant infringe the patent in suit. The defendant has admitted manufacture and sale of these fixtures but denies infringement.

The latter correctly argues that the accused fixtures must be compared for purposes of infringement with the patent as issued and not with plaintiff's fixtures manufactured thereunder. Aileen Mills Co. v. Ojay Mills, Inc., 188 F.Supp. 138 (S.D.N.Y.1960). In view of

42. Muncie Gear Works v. Outboard Marine and Manufacturing Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942).

43. Pf. Ex. #24.

44. Pf. Ex. #53, p. 71.

45. Pf. Ex. #48.

46. Df. Ex. #150.

47. Df. Ex. #243.

our prior findings, however, we cannot accept the defendant's further argument that figures 1 and 2 of the drawings as issued are irreconcilable and therefore render the patent insusceptible of infringement.

 The defendant also takes issue with plaintiff's charge of infringement on the merits. The test applicable in design cases was long ago set forth in Gorham Mfg. Company v. White, 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 731 (1872), where the Supreme Court said:

"We hold, therefore, that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." 81 U.S. at 528.

By way of amplification it should be noted that design patents, like mechanical patents, are entitled to a range of equivalents. Gorham Mfg. Company v. White, supra; Sanson Hosiery Mills, Inc., et al. v. Warren Knitting Mills, Inc., 202 F.2d 395 (3d Cir. 1953). Further, infringement is complete if the defendant's design imparts to the mind the same general idea of ornamentation and appearance as is found in the patentee's design. Mere difference of lines in the drawing or sketch, a greater or smaller number of lines, or slight variances in configuration, if sufficient to change the effect upon the eye, will not destroy the substantial identity.[48] Finally, general appearance, rather than minute detail, constitutes the substance of a design patent, and its imitation the infringement. Harris & Schafer, Inc. v. Curtiss Aerocar Co., Inc., 69 F.2d 264 (5th Cir. 1934).

Defendant's fixtures P-5407, P-5507 and P-5417 have the same general appearance as the patent in suit. Such differences as exist between the individual accused fixtures and the Hadco patent amount to fine distinctions not nor-

mally detectable by the eye of an ordinary observer. Even when closely scrutinized these differences are minute and inconsequential. We therefore hold these fixtures to infringe the patent in suit.

Fixtures P-5608 and P-5607 require individual analysis. Fixture P-5607 is a mere colorable variant of the P-5407 style. In lieu of a vent cap, its finial is so proportioned and flared as to produce substantially the same visual effect as the patent in suit. In overall appearance there is such close similarity that an ordinary observer could readily confuse the two. Fixture P-5608 creates an overall appearance which is similar to that of both P-5607 and the patent in suit. The only difference between fixtures P-5608 and P-5607 is that the former has no base. This is occasioned solely by the manner in which the former is wall-mounted and is therefore of minimal significance with respect to the embodied design. Like P-5607, fixture P-5608 exhibits the dominant motif of the Daum design, thus creating an overall aesthetic effect of identity. For these reasons we hold that fixtures P-5607 and P-5608 also infringe the patent in suit.

*Attorneys' Fees*

 The award of attorneys' fees is reserved for exceptional cases. 35 U.S.C. § 285. A request for such an award is also addressed to the sound discretion of the court. One court has articulated the standard to be applied as follows:

"The standard to be applied in determining whether attorney fees should be awarded to the prevailing party is whether there is a showing of unfairness or bad faith in the conduct of the losing party, or any other equitable consideration of similar force which makes it grossly unfair that the winner of the lawsuit be left to bear the burden of his own counsel fees." Crown Machine & Tool Co. v. Suther-

48. Gorham Company v. White, supra, at 526–527.

land Paper Co. [Crown Machine & Tool Co. v. D & S Industries Inc.] 297 F.Supp. 542, 577 (N.D.Cal.1968), aff'd 409 F.2d 1307 (9th Cir. 1969).

It is the opinion of this Court that plaintiff has not sustained its burden[49] of showing such unfairness or inequity on the part of the defendant as to warrant the awarding of attorneys' fees. The latter was advised by counsel that the patent was invalid and not infringed. It acted in reasonable reliance on that advice and thereafter proceeded to litigate this action in good faith. Such conduct does not rise to the level necessary for the granting of plaintiff's request. Continental Can Co. v. Anchor Hocking Glass Corp., 362 F.2d 123 (7th Cir. 1966); Park-in-Theatres v. Perkins, 190 F.2d 137 (9th Cir. 1950).

49. Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1 (7th Cir. 1953), cert. denied 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075 (1954).