**IMPERIAL CHEMICAL INDUSTRIES, PLC, Plaintiff,**

v.

**HENKEL CORPORATION, Defendant.**

**Civ. A. No. 78–301.**

United States District Court, D. Delaware.

June 18, 1982.

Supplemental Opinion July 23, 1982.

---

Douglas E. Whitney, Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Paul N. Kokulis, Lawrence A. Hymo, William T. Bullinger, Cushman, Darby & Cushman, Washington, D. C., for plaintiff.

William D. Bailey, Jr., Jeffrey M. Weiner, Bayard, Brill & Handelman, Wilmington, Del., Edward M. O'Toole, Michael F. Borun, Madeline Henricks, Merriam, Marshall & Bicknell, Chicago, Ill., Patrick J. Span, Minneapolis, Minn., for defendant.

## OPINION

STAPLETON, District Judge:

The recovery of copper from ore through solvent extraction has gained widespread commercial acceptance over the last decade. The reagents that effect this extraction are the subject matter of this patent case.

1. Henkel acquired General Mills Chemicals, Inc. in 1977. All pre-1977 activities attributed herein to Henkel were conducted by that predecessor in interest.

2. U. S. Patent No. 4,020,106.

Plaintiff Imperial Chemical Industries, PLC ("ICI"), a giant of the chemical world and a relatively recent entrant into the copper extraction reagent field here, alleges patent infringement against defendant Henkel Corporation ("Henkel"),[1] the pioneering firm in this area. Two ICI patents are in issue: the Ackerley and Mack patent[2] which claims a particular reagent, 5–nonyl–2–hydroxy benzaldoxime, and the Dalton patent[3] which claims a solvent extraction process utilizing the Ackerley and Mack compound plus an additive, nonyl phenol. Henkel claims that both ICI patents are invalid because anticipated, obvious, and non-useful; that both are unenforceable because of ICI's conduct in prosecuting the patents; and that there has been no infringement. This Opinion constitutes the Court's findings of fact and conclusions of law after trial on the merits.

## I. BACKGROUND FACTS.

### A. The Solvent Extraction Process.

Solvent extraction is part of a three step process for recovering purified copper metal from ores containing small percentages of copper. The three steps in this process are (1) "leaching", the use of sulfuric acid or ammonia to dissolve copper from ores also containing other metals to form an aqueous solution; (2) "solvent extraction", the concentration and purification of the copper metal; and (3) "electrowinning", the recovery of the purified copper by electrolysis. The solvent extraction step has two stages —"extraction" and "stripping".

The starting material for the solvent extraction of copper is the aqueous leach solution. The leaching medium contains salts of coppers and other metals that it dissolved as it was trickled through the ores.[4] In order to separate the copper from the other materials contained in the solution,

3. U. S. Patent No. 4,142,952.

4. There are four types of leaching: vat leaching, agitation leaching, dump leaching, and heap leaching.

this aqueous solution is then mixed with another solution containing a copper extracting reagent. This is the "extraction" stage of the solvent extraction process.

The copper extracting reagent is dissolved in an organic solvent, normally kerosene. The kerosene solution will not dissolve in the aqueous solution; rather the two liquids are agitated together in large tanks, called mixers, to form small droplets so that the copper can transfer from the aqueous solution to the kerosene. The copper extracting reagent dissolved in the kerosene then "grabs hold" of the copper dissolved in the aqueous solution by forming a reagent-copper complex.

The kerosene, now containing the reagent-copper complex in solution, is then allowed to separate from the depleted aqueous solution. The mixing tank has an outlet which feeds into a large settling tank where this "phase separation" (*i.e.* the organic phase from the aqueous phase) takes place. Usually, this process of extraction and phase separation is repeated through two or more mixer-settler stages.

In the next step, the "loaded" organic solvent containing the reagent-copper complex is transferred to a different set of mixer tanks where the copper is "stripped" from the kerosene.[5] This stripping is accomplished by mixing with another aqueous solution containing concentrated sulfuric acid and water. The highly acid strip solution breaks apart the reagent-copper complex and thus transfers the now purified and concentrated copper to the aqueous strip solution. As in the extraction process, the mixture is fed through two or more

mixer-settler stages to facilitate the stripping of the copper from the organic phase.

The solvent extraction process is completed because this aqueous strip solution now contains only copper ions. The solution is then fed to another part of the plant,[6] where the copper is collected on metal plates in a process called electrowinning.[7]

### B. *Copper Extraction Reagents—The Chemistry.*

With one exception,[8] all of the copper extracting reagents that have been developed for use in the solvent extraction process fall within a general category of chemical compositions called hydroxy aryl oximes. As the name suggests, these compounds have three essential components:[9]

(1) a hydroxy group — OH

(2) a benzene ring
 (designated by "aryl") [9]

(3) an oxime group $-\overset{\text{NOH}}{\underset{}{C}}-$

In order for the hydroxy aryl oxime to be able to form a compound with the copper ion, and thus capture it from the leaching solution during solvent extraction, it is necessary that the hydroxy and oxime groups occupy adjacent positions on the benzene ring. The adjacent hydroxy and oxime are sometimes referred to as the two pincers of the "chelating claw" of the molecule and the process by which the copper ions in the aqueous solution form a copper-reagent complex in the organic solvent is frequently called "chelation".[10]

5. Meanwhile the depleted aqueous feedstock ("raffinate") is either discharged or recirculated to the ore site for further leaching.

6. Meanwhile, the stripped organic phase is recirculated to the extraction mixers to begin extraction again.

7. The positively charged copper ions in the aqueous solution are attracted to negatively charged deposition plates (cathodes) when an electric current is passed through the aqueous solution.

8. The one exception is the Kelex reagent which is a hydroxy quinoline.

9. This symbol used to represent the benzene ring is shorthand for the chemical structure

10. Thus, the reaction looks like this:

The 2–hydroxy aryl oximes that have been used as copper extracting reagents can be classified according to what is attached to the open end of the carbon in the oxime group. Henkel's leading copper extracting reagents, which are identified by the LIX [R] prefix,[11] are benzophenone oximes. Benzophenone oximes are a subcategory of 2–hydroxy aryl oximes which have a second benzene nucleus attached to the open carbon atom:

OH

NOH

The ICI reagents which are described in the patents in suit are benzaldoximes, also known as salicylaldoximes. Salicylaldoximes are 2–hydroxy aryl oximes which have a hydrogen atom attached to the open carbon atom:

OH

NOH

C—H

In addition to this basic structure, the hydroxy aryl oximes used as copper extraction reagents have a long chain alkyl group[12] attached to the benzene ring. The attachment of the alkyl group is generally necessary so that the hydroxy aryl oxime will be soluble in the organic solvent and insoluble in the aqueous solution. The "solubilizing tail" is symbolized by R and generally in the 5 position so that most hydroxy aryl oxime reagents share the following structure:

OH

NOH

C—

R

### C. Reagent Properties—The Seven S's.

There are seven desirable properties which provide the basis for evaluating copper extraction reagents. These were referred to by the experts at trial as the "seven S's": strength, selectivity, solubility, speed, separation, stability, and synthesis.

*Strength* refers to the ability of the extractant to hold onto copper. A strong reagent has a greater ability to draw copper

Copper Ions + Copper Extracting Reagent → Copper Reagent Complex
(2-hydroxy aryl oxime) (Chelate)

$CU^+$ +

OH NOH

C—

→

O—CU
NOH

C—

---

**11.** Registered trademark for liquid ion exchange reagents. Henkel's benzophenone oximes include LIX [R]64, LIX [R]64N and LIX [R]70.

**12.** An alkyl group is made up of a number (n) of carbon atoms in chain form, having the formula, $C_n H_{2n+1}$. Examples are nonyl ($C_9 H_{19}$) and dodecyl ($C_{12} H_{25}$). Shorthand form is often used for these groups, *e.g.* nonyl is represented by $C_9$.

from the aqueous leach solution; that is a desired characteristic. A strong reagent, however, also tends to hold onto copper more strongly during stripping, which is not desired. The key to strength then is for a reagent to be as strong as possible in the extraction phase, but as weak as possible in the stripping phase, thus maximizing "net copper transfer". The stronger the reagent, generally the more effective it is in extracting copper from highly acidic (low pH)[13] aqueous leach solutions.

*Selectivity* refers to the ability of the reagent to extract copper ions while not attracting other metals. A highly selective reagent is one which has high affinity for copper but a low affinity for iron and other metals. Thus, it takes up copper relatively easily but takes up little else from the aqueous leach solution.

*Solubility* refers to the amount of reagent and its copper complex which can be dissolved in kerosene while not being dissolved in the aqueous solution. Higher solubility is desirable, because it allows more reagent, and therefore more copper, to be handled by a given amount of kerosene and a given size plant.

*Speed*, also called "kinetics", refers to the rate at which copper is transferred between the aqueous solution and the kerosene solution during both extraction and stripping stages. If the speed is high, the time of contacting kerosene and water solutions is reduced, so that the reagents can generally flow through the plant at a higher speed. High speed can also reduce the number of mixer-settler stages in a plant, by increasing stage efficiency.

*Separation* is the rate at which the emulsified kerosene and water separate in the two phase separation stages of the solvent extraction process. Faster separation permits a faster rate of flow through the plant.

*Stability* refers to the resistance of the reagent to decomposition when in contact with the relatively concentrated sulfuric acid solution used during stripping. Lack of stability can affect performance in two ways: first, chemical products resulting from the degradation of the reagent may adversely affect reagent performance, and second, degradation results in the loss of reagent from the recycling kerosene solvent. Any reagent lost through decomposition must be replaced if plant capacity is to be maintained, thus increasing expense.[14]

*Synthesis* relates to the quality and consistency of the extractant. As small amounts of reagents are lost during operations, a certain amount of make-up must be added to the existing reagent, and continuity of performance must be maintained. Therefore, the reagent must be capable of being manufactured easily in a consistent manner to achieve consistent quality.

### D. The Patents In Suit.

#### 1. The Ackerley and Mack patent.

The Ackerley and Mack patent, as finally approved by the patent examiner,[15] is limited to one claim:

A mixture of 5–nonyl–2–hydroxy benzaldoximes wherein the nonyl is a mixture of branched chain isomers.[16]

The chemical structure of this compound is thus illustrated as follows:

---

13. Acidity relates to the concentration of hydrogen ions in a water solution, which is indicated by pH. pH can vary from 0 to 14; anything lower than 7 is acidic, with acidity increasing as pH decreases.

14. Small amounts of reagents are also carried away by "entrainment".

15. DX 59.

16. Molecules which contain the same number and kinds of atoms, but which differ in the spatial positions of the atoms, are known as isomers. A mixture of isomers is thus different from a "pure" compound. A "branched chain" is to be distinguished from a straight chain.

$$OH \quad NOH$$

(structure: a benzene ring with OH at top, $C_9$ substituent at bottom, and a $-C(=NOH)-H$ aldoxime group)

The U. S. application for the Ackerley and Mack patent was filed on March 13, 1973.[17] The original claims were rejected by the examiner because some of its claims were anticipated and others obviously based on the prior art. An amendment left the single narrowed claim, which was subsequently rejected as obvious in view of the prior art. Thereafter, the applicants filed affidavits tending to show that the claimed invention possessed properties markedly superior to those of reagents in the prior art, namely solubility, speed and separation. On April 26, 1977, the patent in suit issued.

The chemical compound which ICI produced in accordance with the teachings of the Ackerley and Mack patent is referred to as P–1.

### 2. The Dalton patent.

The claims of the Dalton patent[18] are technically directed to a *process* for solvent extraction, rather than to a copper extracting reagent, *per se.* The process of solvent extraction described, however, differs from known solvent extraction processes only in its use of a modifier in preparing the copper extraction reagent. Specifically, the Dalton patent claims a process in which the reagent is a mixture of 5–nonyl salicylal-

doximes and nonyl phenol, in which the weight of the nonyl phenol is 0.1 to 20 times the weight of the salicylaldoxime. ICI manufactured two reagents based on the Dalton patent:

> P–5100 = 50% P–1 + 50% nonyl phenol
>
> P–5300 = 25% P–1 + 75% nonyl phenol

Dalton's U. S. patent application was filed on January 3, 1977, but the parties agree that ICI is entitled to an effective date of January 30, 1976, based on its earliest British priority application. The patent examiner initially rejected the claimed invention as obvious from the prior art. After ICI submitted affidavits, however, the Dalton patent issued on April 17, 1978.

### E. The Development Of Copper Extraction Reagents.

The solvent extraction process for recovering metals was first introduced in the 1950's as a means for obtaining uranium. Solvent extraction of uranium was commercially feasible at that time because uranium sold at a much higher price than other metals such as copper.

Henkel was the pioneer, and for a long time the lone entrant, in the field of developing solvent extraction reagents for copper. It introduced its first LIX[R] reagent, LIX[R]63 in 1963.[19] This reagent was selective for copper, but failed to gain commercial acceptance because it was too "weak" to extract copper from leach solutions which had a pH of 2.0 or below.

Shortly thereafter, Henkel developed LIX[R]64, its first benzophenone oxime.[20] LIX[R]

17. An earlier British Provisional Specification was filed on March 21, 1972.

18. PEX 680.

19. LIX[R]63 is a hydroxy oxime, but not a hydroxy aryl oxime because it does not have a benzene ring. The formula is:

$$CH_3(CH_2)_3 \underset{\substack{| \\ C_2H_5}}{CH} - \underset{\substack{| \\ OH}}{CH} - \underset{\substack{| \\ C_2H_5}}{C}\underset{NOH}{CH}(CH_2)_3 CH_3$$

20. The structure of LIX[R]64 is as follows:

(structure: a benzene ring with OH and a $-C(=NOH)-$ group bridging to a second benzene ring, with $C_{12}$ substituent) plus LIX[R]63

64 was able to operate at a pH level of 2.0. One of the first breakthroughs in commercial acceptance occurred in 1965 when Bagdad Copper Company constructed a pilot solvent extraction plant in Arizona using Henkel's LIX [R]64. The first commercial scale copper solvent extraction plant was at Bluebird Mine, also in Arizona, which began operations in 1968. Bluebird started with LIX [R]64 as its reagent, but it was soon replaced by a new Henkel reagent, LIX [R] 64N. LIX [R]64N had a structure [21] similar to that of LIX [R]64 but possessed improved properties including greater loading capacity, greater speed and faster separation. By 1972, LIX [R]64N was in use in four plants in the United States, but all had capacities of 40,000 pounds per day or less. In 1974, Henkel achieved major success when the giant N'Changa Consolidated Copper site, operated by Anglo America Mining Company of South Africa, began using LIX [R]64N at a capacity of 400,000 pounds per day.

Although Henkel was the earliest entrant in the copper extraction field, other companies soon began marketing competing reagents. In the late 1960's, Kelex introduced Kelex 100, followed shortly by Kelex 120, both of which were hydroxy quinoline reagents. Shell also introduced a reagent, SME 529, in the early 1970's.

As early as 1967, Henkel realized that there were many copper mining situations in which the copper concentration in the leach was sufficiently high or the pH of the leach solution sufficiently low that LIX [R]64 and LIX [R]64N could not perform satisfactorily. This potential segment of the market was of sufficient size that Henkel, by mid-1967, had set as a high priority goal for its research and development people the "development of a reagent for the extraction of copper from concentrated solution

21. The structure of LIX [R]64N is as follows:

and/or low pH solutions." [22] Four reagents emerged from this research and development effort: XI–13, LIX [R]70, LIX [R]71 and LIX [R]72. Each was superior to LIX [R]64N in its ability to extract copper from leach solutions that contained high concentrations of copper and/or acid. Each had other problems, however, and none was commercially successful.

When arguing before the PTO in April 1971 in support of the patentability of LIX [R]70, Henkel stressed the need it had perceived in the marketplace:

> These compounds were discovered to meet *a need in the industry* for an extractant which would be effective at low pH's. Previously discovered compounds were found to have reduced extraction efficiencies at low pH's and were thus not commercially attractive in extracting copper values from low pH aqueous solutions thereof. (Emphasis added).

ICI entered the copper extraction reagent field in 1971. Its evaluation of the market was similar to that of Henkel and it decided to concentrate on developing reagents that would be effective with leach solutions having a pH below 2.0. By January 7, 1972, ICI had tested sixteen different compounds and had selected seven for further investigation. One of the compounds which passed the first screening was salicylaldoxime. Norman Ackerley was assigned to pursue this possibility and proceeded to test salicylaldoxime for solvent extraction. After Ackerley obtained positive results, Peter Mack undertook the task of synthesizing kerosene soluble derivatives of salicylaldoxime. He found that solubility could be achieved by adding an aliphatic chain. He also found from the literature that salicylaldoximes could be made from phenols.

Over a period of approximately six months, from February to August 1972,

22. PEX 30, 31 and 33.

plus LIX[R]63

Mack synthesized a large number of derivatives of salicylaldoxime, including 5–tertiary butyl salicylaldoxime, 5–nonyl salicylaldoxime, 3,5–di–tertiary amyl salicylaldoxime, 5–dodecyloxy salicylaldoxime, and 5–octyl salicylaldoxime. Each was evaluated for solubility and subjected to pH titrations to obtain information on strength and selectivity. Of the reagents synthesized, only two turned out to have a very high degree of solubility in kerosene, 5–nonyl salicylaldoxime and 3,5–di–tertiary amyl salicylaldoxime. Although both of these compounds had excellent solubility, 3,5–di–tertiary amyl salicylaldoxime was a very weak extractant and lost its effectiveness in strongly acidic or concentrated copper solutions. On the other hand, 5–nonyl salicylaldoxime, or P–1 as it was then referred to, was a suitably strong reagent.

Because of the interest generated by its properties, P–1 was evaluated extensively and within a very short time. By the end of June 1972, less than two months after Mack had synthesized P–1, ICI had made significant comparisons between P–1 and the then commercially available Henkel reagents. In particular, comparisons were made with LIX 70, Henkel's contemporaneous attempt to satisfy the need for a strong reagent. It was reported for the period ending June 1972:

> 5–nonyl salicylaldoxime has emerged from an intensive screening program as a very promising candidate and, while further work on stability and kinetics of extraction and back-washing is necessary, it is comparable to LIX 70 in extraction efficiency and superior in phase disengagement, copper complex solubility, back-washing characteristics and net transfer capacity. This ligand is, therefore, being further evaluated with considerable urgency.

Shortly thereafter, on July 11, 1972, Dr. Dalton determined that P–1 had very rapid kinetics. In addition, because of its high solubility, lower molecular weight and 100% active anti isomer, P–1 was a much higher

loading reagent than LIX 64N. It was also found to have better phase disengagement.

A number of difficulties were encountered by ICI in attempting to provide a manufacturing process for P–1. The original laboratory method has the possibility of producing, as a by-product, dichlorodimethylether which is regarded as a possible human carcinogen. Difficulties were also encountered with the resulting yield. It was not until January of 1975 that an alternative method was discovered which avoided the health hazard problems and yet produced a good yield. By this time the development of a satisfactory route to manufacture P–1 had consumed over three years from September 1972 through November 1975. Thus, commercial development of P–1 was significantly delayed.

As part of his evaluation of P–1, Dr. Dalton evaluated the effect of nonyl phenol as an additive to P–1 in July 1973. He has no recollection of what it was that caused him to conduct the experiment, but he observed that the net copper transfer capacity of P–1 increased when nonyl phenol was added. This effect was duly reported by Dr. Dinwoodie on September 3, 1973.[23]

Greater attention was attracted to Dr. Dalton's findings in late September 1975 when ICI focused its attention on trying to adapt P–1 to existing solvent extraction plants, as distinguished from those which would be designed to accommodate the properties of P–1. At a meeting in September of 1975, there was discussion of the possibility of using additives to improve the cost effectiveness of P–1. Dr. Dalton reported his earlier observations and suggested that nonyl phenol might provide a way to increase the effectiveness of P–1 in the existing plants and thus lower the cost.

Without significantly diminishing the favorable performance of P–1 under extraction conditions, Dr. Dalton was able through the use of nonyl phenol as an additive to substantially increase the amount of copper given up in stripping. The amount of copper transferred by P–1, during one complete circuit, was thus substantially increased. As a result of Dr. Dalton's work,

23. DEX 142.

when the manufacturing process was finally developed in 1975, ICI was able to offer P-1 with the improvement contributed by nonyl phenol.

ICI marketed P-1 with a nonyl phenol additive under the tradenames P-5100 and P-5300. These reagents received immediate acceptance at Kennecott's Ray Mine in 1976 and have continued to experience commercial success since that time.

As information about ICI's P-5000 series reagents became available in the marketplace, Henkel became increasingly concerned about their performance and its competitive position. On May 10, 1976, for example, Mr. House reported to Dr. Spliethoff, the company executive vice president:

> ... P-5300 is giving us cause for concern. Its very rapid phase disengagement properties are such that engineering and metal companies are talking two extraction stages and two strip stages. This represents a 30% cost savings in construction. We still do not know the "magic" additive used by Acorga—as all efforts to obtain samples have not been productive.[24]

Shortly thereafter, Dr. Spliethoff reported to the company's president, Mr. Carlson:

> In the competitive area, the ICI/Anglo reagent, P-5300, is giving us some cause for concern. It now appears that it has the ability to disengage very rapidly in the mixer settler, which would mean substantially lower capital costs for potential plants using this reagent. We are trying to obtain samples to determine analytically and by testing in our own laboratories what causes this effect in this reagent. If all other properties in this reagent are good, it will be a serious competitive threat particularly in the areas where new plants are being put in since one of the restrictive factors in the use of solvent extraction technology has always been initial capital cost.[25]

On June 9, 1977, Dr. Taft reported to Mr. House:

> The ICI P-5100 compared to LIX 64N gives better extracting power, better selectivity, better kinetics, and possibly better phase separation than LIX 64N. Although the material is less stable and will not strip as easily, it probably requires a smaller plant investment and a smaller reagent inventory versus 64N.[26]

Initially, Henkel thought that ICI's P-5000 reagents might have a stability problem. While they are not as stable as LIX[R] 64N, this deficiency turned out not to be a serious problem, however, and was more than compensated for by their other properties. As Mr. House reported to Dr. Spliethoff on August 17, 1977, "the stability questions pale in the light of the kinetics."[27]

Ultimately in order to compete with the Ray Mines' solvent extraction plant contract, Henkel offered a reagent which it called LIX [R]605. LIX [R]605, like ICI's P-5000 reagents, is a mixture of 5-nonyl-2-hydroxy benzaldoxime and nonyl phenol.

F. *The Level Of Skill In The Art.*

Those struggling to develop copper extraction reagents with improved properties during the period from 1967 to 1977 tended to be quite highly skilled. The typical researcher had academic training or field experience providing skills equivalent to those expected of a doctorate in organic chemistry.

Those responsible for Henkel's research and development efforts in this area, by virtue of the experience, had skills which significantly exceeded those of the average artisan.

## II. USEFULNESS OF ACKERLEY AND MACK.

Although Henkel does not dispute the usefulness of the Dalton patent, it does contend that the Ackerley and Mack patent

---

**24.** PEX 89.

**25.** PEX 98.

**26.** PEX 107.

**27.** PEX 195.

is invalid for lack of utility.[28] Noting the fact that P–1 was not a commercial success, Henkel argues that the Ackerley and Mack compound failed to achieve its stated purpose, effective use in "conventional" solvent extraction plants. Henkel's argument on this issue fails for several reasons.

Preliminarily, it should be noted that commercial success is not the standard of usefulness under the Patent Act. "The product of a patented process is useful if it may serve some identifiable purpose other than merely being the end product of a series of chemical reactions. To require the product to be the victor in the competition of the marketplace is to impose upon patentees a burden far beyond that expressed in the statute." *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1339 (5th Cir. 1980). Thus, ICI need not show that the Ackerley and Mack patent claims a product that is a commercial success, but rather that the product can be used in the described solvent extraction process.

Moreover, P–1's failure to achieve commercial success is attributable to the emergence of Dr. Dalton's improvement before P–1 was marketed. By the time ICI solved its manufacturing problems, Dr. Dalton had suggested adding nonyl phenol to increase efficiency; accordingly, P–1 was marketed with this improvement. If the Dalton discovery had not been made, however, I believe ICI would have been able to persuade potential customers that P–1 would out perform LIX [R]64N in plants designed to take advantage of P–1's special properties.

It is true, as Henkel stresses, that P–1, like most strong extractants, was difficult to strip. It is not true, however, that its stripping characteristics rendered it useless as a reagent for solvent extraction plants built in accordance with the conventional technology of the day.[29] Contrary to Henkel's contention, the documentary record does not suggest that P–1 was a total failure in its test runs at existing facilities. Rather, it shows that plants designed for other reagents, could generally not take advantage of P–1 strengths in areas like speed and phase separation in such a way as to offset P–1's competitive disadvantages in stripping.[30]

My prediction on how P–1 would have fared if it had been marketed without Dr. Dalton's improvement is based primarily, however, on the testimony of Dr. Massam. Dr. Massam constructed small scale pilot plants in which he tested LIX [R]64N and P–1 under identical conditions. Each plant was designed to best accommodate the properties of its reagent. To take advantage of P–1's rapid speed and phase separation, its pilot plant was designed with greater pumping capacity so that P–1's disadvantage in net copper transfer efficiency per cycle was offset by increasing the speed and therefore number of cycles. In addition, smaller mixers and settlers made plant costs more economical. Comparative tests showed that with a feed of pH 2, and a strip solution of 150–180 grams per liter sulphuric acid, P–1, because its speed and phase separation properties cut down on capital costs, could do the same job as LIX [R] 64N at half the cost. Dr. Massam noted that if the pH of the leach solution were lower, the cost differential in favor of P–1 would have been even greater.

---

**28.** 35 U.S.C. § 101 states that one who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor."

**29.** The Ackerley and Mack patent specifications describe the claimed reagent as being useful in "conventional" solvent extraction plants. Contrary to Henkel's suggestion, I do not read this reference as limited to pre-existing plants whose dimensions and other specifications were determined with prior art reagents in mind. Rather, it includes plants built with conventional technology but designed to maximize the benefits flowing from the properties of the reagents used.

**30.** Thus, DX 112, while initially concluding that P–1 was unsuitable for the N'Changa plant because of certain problems related to stripping, did so in the context of noting P–1's other advantages and suggesting possible changes in the plant structure to accommodate P–1 more effectively.

## III. SECTION 102 AND THE ACKERLEY AND MACK PATENT.

In 1970, Dr. J. R. Parrish was a professor at Rhodes University in South Africa. In that year, he published a paper entitled "Selective Liquid Ion Exchangers II. Derivatives of Salicylaldoxime" which described work he had done in synthesizing and evaluating copper extraction reagents for use in solvent extraction. The paper concluded that 2–hydroxy benzaldoximes, because of their chelating abilities, could be used effectively as copper extraction reagents when an aliphatic chain was attached to confer the necessary solubility in the organic solvent.

Parrish noted that an early problem in finding suitable solvent extraction reagents was effectiveness with low pH leach solutions. He also noted that LIX $^R$64N had recently been introduced and that it had proven able to extract at pH 1.5. He reported that he had run experiments which demonstrated that 5–octyl 2–hydroxy benzaldoxime and 5–dodecyl 2–hydroxy benzaldoxime compared favorably on this count. In addition, Parrish demonstrated that these compounds had the necessary selectivity to be effective copper extraction reagents.

In conducting his experiments, Parrish used two salicylaldoximes, 5–octyl 2–hydroxy benzaldoxime[31] and 5–dodecyl 2–hydroxy benzaldoxime.[32] Parrish explained how he synthesized each of these compounds, and reported that the octyl in the octyl reagent was a pure, single isomer, while the dodecyl in the dodecyl compound was a mixture of branched chain isomers. He explained that the pure octyl was chosen in order to provide the "best reaction conditions" but noted that the pure octyl reagent demonstrated much less solubility in the organic solvent than the dodecyl mix-

31. I.e., a 2–hydroxy benzaldoxime with a C$_8$H$_{17}$ chain attached to the 5 position.

32. I.e., a C$_{12}$H$_{25}$ chain attached at the 5 position.

33. DX 59, p. 130.

ture. He noted that, on the basis of this and earlier research, he believed that the "solubility of various liquid ion exchangers in kerosene depends less on the structure of the long alkyl chain than on the presence of a mixture of isomers." [33]

■ Henkel urges that the claim-in-suit is anticipated by Parrish's paper. I do not agree. As this Court has had occasion to observe "a prior art reference must teach the very invention of the patent at issue in order to anticipate it." *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 404 F.Supp. 547, 548 (D.Del.1975) *aff'd* 558 F.2d 58 (3d Cir. 1977). Parrish did not describe the 5–nonyl–2–hydroxy benzaldoxime claimed by Ackerley and Mack. Nor, contrary to Henkel's assertion, does Parrish suggest that nonyl phenol be considered as a starting material. The words "nonyl phenol" appear only in the title of a brochure, "Octyl Phenol, Nonyl Phenol", included as one of sixteen footnote references at the end of the Parrish paper. In context, the footnote suggests nothing more than that one may find more information in this brochure about the source of the octyl phenol used by Parrish.

■ Parrish does refer in places to salicylaldoximes in general. His reported experiments, however, involve only two particular salicylaldoximes and he does not claim that the results with these two samples will be consistent with any aliphatic tail added. Nor does he provide any evidence upon which such a conclusion would be reached. Parrish, by reporting the results achieved with two salicylaldoximes, may suggest to a person of ordinary skill in the art, that a similar salicylaldoxime would achieve similar results; he does not, however, describe a broad class of salicylaldoxime reagents.[34]

34. Moreover even if Parrish were read liberally to disclose such a broad class, the general rule, which would be applicable here, is that the disclosure of a chemical genus does not constitute an anticipation of a specific compound falling within that broad genus. Chisum, *Patents* § 3.02[2].

## IV. SECTION 103 AND THE ACKERLEY AND MACK PATENT.

The patent examiner found that the structure of the composition claimed by Ackerley and Mack was obvious from Parrish. ICI did not, and does not, contest that finding. One of ordinary skill in the art in March of 1973 would have realized upon reading Parrish that he or she could synthesize 5–nonyl–2–hydroxy benzaldoxime. Moreover, such an artisan would have expected that this compound, once synthesized, could be utilized to extract copper through solvent extraction. This does not preclude patentability, however. In determining whether a new compound meets the non-obvious requirement of Section 103, a court "should consider all of . . . [its] properties . . .—including its structure, uses, and other traits—and compare those properties with their counterparts in the prior art. If the new compound, although structurally obvious, exhibits new uses or traits that, at the time of their discovery, were not predictable to . . . persons skilled in the prior art, such differences indicate that the new compound is nonobvious for purposes of § 103." *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 130 (3d Cir. 1980).

What Ackerley and Mack claimed to have discovered was a reagent which was capable of extracting copper from low pH and high concentration leach solutions, and which was characterized by high solubility, a very rapid rate of extraction, and excellent phase separation. They assert that the characteristics of their reagent as a whole make it far superior to any prior art reagent for extraction in low pH or high concentration leach solutions and that one of ordinary skill in the prior art in March 1973 would not have expected to achieve this superiority by employing 5–nonyl–2–hydroxy benzaldoxime.

Henkel does not dispute that Ackerley and Mack's 5–nonyl–2–hydroxy benzaldoxime has substantially faster kinetics and better phase separation than Parrish's 5–dodecyl 2–hydroxy benzaldoximes or his 5–octyl 2–hydroxy benzaldoxime. Nor does it dispute that the claimed compound is substantially more soluble in a kerosene solvent than Parrish's single isomer 5–octyl 2–hydroxy benzaldoxime. Henkel does argue, however, that an artisan of average skill in March of 1973 would have expected that the claimed compound would provide these advantages. Specifically, Henkel asserts that, based on the teachings of Parrish with respect to solubility, one would expect that 5–nonyl–2–hydroxy benzaldoxime wherein the nonyl is a mixture of branched isomers would exhibit the very high solubility of Parrish's mixed isomer dodecyl compound, rather than the poor solubility of his single isomer octyl compound. Similarly, Henkel maintains that one of ordinary skill in the art, based upon the compositions of LIX $^R$64 and LIX $^R$64N and a prior art article by DeMent and Merigold, would have expected the improved speed and separation that Ackerley and Mack obtained.

With respect to solubility, the record contains no prior art teaching contrary to the teaching of Parrish that a mixture of isomers is more important as far as solubility is concerned than the number of carbon atoms in the chain. Accordingly, based on Parrish, I believe one of ordinary skill in the art would have anticipated that a 5–nonyl compound consisting of mixed isomers would be highly soluble like Parrish's 5–dodecyl compound.[35] Nevertheless, I am confident that the same artisan would not have anticipated from the prior art that the claimed compound would provide the commercially significant combination of beneficial properties which it in fact possesses. Having so concluded, it follows that the patentability standard of Section 103 has been met. *Cosden Oil & Chemical Company v. American Hoechst Corporation*, 543 F.Supp. 522 (D.Del.1982).

Parrish said nothing about speed or phase separation. Nor did any other prior art

---

**35.** I credit the testimony that the ICI workers were "surprised" and delighted to find 5–nonyl–2–hydroxy benzaldoxime fully miscible in organic solvent. At the time they made this observation, however, I do not believe they were familiar with the Parrish paper.

reference say anything about the speed or phase separation of 2–hydroxy benzaldoxime. Thus, the artisan had no information suggesting a pattern or other theory for predicting improved speed or phase separation and would likely have assumed that the speed and separation of 5–nonyl–2–hydroxy benzaldoxime would be similar to the structurally similar compounds of Parrish. Henkel contends that any artisan initially inclined to make such an assumption would be dissuaded, however, by a consideration of the compositions of LIX $^R$64 and LIX $^R$ 64N and of an article by two Henkel researchers about the properties of these reagents.

Henkel correctly points out that the commercial use and sale of LIX $^R$64 and LIX $^R$ 64N are items of prior art. It contends that their compositions were "susceptible of routine analysis" and were reflected in several prior art publications. Building on this assumption that the artisan of ordinary skill would thus know that LIX $^R$64N, unlike its predecessor, had a 5–nonyl substituent, Henkel points to a paper by its researchers, DeMent and Merigold, which reports that LIX $^R$64N "loads and strips more rapidly" and has better phase separation than LIX $^R$ 64.[36] Henkel's argument is unpersuasive, however, for at least two reasons.

The record reveals that there was considerable speculation among those seeking to develop reagents about the structure of LIX $^R$64N and that a number of individuals published the results of their analysis of that reagent. It also reveals, however, that the reported results were not consistent with each other.[37] The record further shows that Henkel had no desire to clear up the confusion in the art and, indeed, was denying that anyone had succeeded in accurately analyzing LIX $^R$64N. In 1976, for example, Imperial Smelting Processes Limited, in connection with prosecuting a patent, asked Henkel to refer it to a publication which described the structure of LIX $^R$ 64 and LIX $^R$64N. Mr. House of Henkel responded:

I very much regret to inform you that I was unable to find publications or patents which would solve your problem. It has been the policy of General Mills Chemicals, Inc. not to link our trademarked products with the structure of the component or components contained therein. Thus we have no patents or publications which would be of assistance. . . . I also reviewed a number of patents or publications by others which had disclosures relating to one or more of our LIX $^R$ reagents. In all instances, these disclosures were inaccurate to a degree either through (1) failure to give the right structure for the component or components, (2) failure to set forth that the reagent contained more than one component and/or (3) failure to define the percentages of the component or components.

In this context, I cannot find that one of ordinary skill in the art would have had sufficient knowledge to accurately compare the structures of LIX $^R$64 and LIX $^R$64N.[38]

Moreover, even if one knew the structure of these Henkel reagents, the presence of a 5–nonyl substituent in LIX $^R$64N was not the only difference between them, and neither DeMent and Merigold nor any other prior art reference provided a basis for attributing the increased speed and phase separation of LIX $^R$64N to its 5–nonyl substituent. For example, Henkel's trial expert, in a prior art paper, noted that "the important difference between LIX $^R$64 and LIX $^R$64N is that only the active (anti) isomer is present in LIX $^R$64N."[39] The record in this

---

**36.** DX 58, p. 2.

**37.** That there was no publicly available information regarded by the art as reliable is evidenced by the fact that ICI attempted to analyze and developed its own theory regarding the structure of LIX $^R$64N. (DX 88).

**38.** I credit Mr. Swanson's testimony regarding his analysis of LIX $^R$64 and LIX $^R$64N during their manufacture. As a Henkel employee, however, he was aware of their structure; his experience is not necessarily reflective of what one of ordinary skill, but without that knowledge, would have been able to do.

**39.** DEX 396, p. 23.

case suggests no reason why those studying the prior art could attribute LIX [R]64N improved kinetics and separation to the nonyl group rather than to this "important" difference.

Nor does the record provide a basis for concluding that one of ordinary skill in the art would believe that observations of LIX [R]64 and LIX [R]64N would be likely indicators of the results one would achieve with salicylaldoximes. In addition to the structural differences between benzophenone oximes and salicylaldoximes, LIX [R]64 and LIX [R]64N utilized a kinetic catalyst while Parrish and Ackerley and Mack's compounds did not. The testimony of both Mr. Rees and Mr. Swanson indicates to me that prediction of results in an uncatalyzed system would involve substantial uncertainty.

In summary, I find nothing in the prior art which would affirmatively suggest to the prior art student that 5–nonyl–2–hydroxy benzaldoxime would be a copper reaction reagent far superior in its overall properties to Parrish's 5–octyl and 5–dodecyl compounds. The improvements achieved by Ackerley and Mack were thus not only substantial but unexpected. It follows that their reagent is not obvious from the prior art within the meaning of 35 U.S.C. § 103.

The secondary evidence provides additional support for the conclusion that the Ackerley and Mack invention was not obvious. Henkel, as the acknowledged leader in the field of copper extraction reagents, had the most experienced people in the art. We know that they undertook a program as early as 1967 to develop a strong extractant with advantageous properties. From Henkel documents, as well as from the evidence regarding the important relationship between speed and separation on the one hand and capital and operating expense on the other, we know that Henkel and others had substantial motivation to come up with a strong extractant having better speed and

separation properties than existing reagents.

Parrish was published in September of 1970. Henkel's researchers read it before the end of 1970, at the latest. The motivation for these men and other workers in the art to accomplish what ICI did in P–1 continued until the issuance of the Ackerley and Mack patent on April 26, 1977. Henkel's efforts did not succeed; those of others apparently were no more fruitful.

Also significant is the reaction of Henkel's researchers to ICI's P–5000 series reagents when they appeared in the market in 1976. That reaction is relevant despite the fact that these reagents had the benefit of Dalton's improvement in stripping capability because the record demonstrates that their kinetics and separation characteristics are attributable to P–1.[40] When Henkel's researchers learned of the performance of P–5100 and P–5300, these men of extraordinary skill in the art, who had been working to produce such a product for almost ten years and who had been exposed to Parrish's teachings for almost six, described these new compounds as having "very rapid phase disengagement properties"[41] and kinetics that were "surprisingly fast."[42] Moreover, in addition to being surprised by the speed and separation that ICI had achieved, they theorized that these characteristics were attributable to some "magic additive" of unknown composition.[43] Significantly, they did not attribute these improvements to the 5–nonyl–2–hydroxy benzaldoxime which was structurally obvious from Parrish.

This circumstantial evidence buttresses the conclusion that one of ordinary skill in the art in March of 1973, based upon the then existing art, would not have expected 5–nonyl–2–hydroxy benzaldoxime to possess the combination of properties which it in fact possesses in the context of the solvent extraction of copper.

40. The addition of nonyl phenol to P–1 actually reduces its speed. The increase in net copper transfer, however, more than offsets this drawback.

41. PEX 89.

42. PEX 100.

43. PEX 89.

## V. SECTION 103 AND THE DALTON PATENT.

Henkel asserts that the Dalton patent is anticipated by the U. S. Patent 3,725,046 issued to Hartlage on April 3, 1973. I assume, without deciding, that Hartlage does not anticipate Dalton. It is apparent, however, that one of ordinary skill in the art in July of 1973 would find it obvious from Hartlage not only to do what Dalton did but also to expect exactly what he achieved. As a result, Dalton's contribution to the art does not meet the patentability requirement of Section 103.

Hartlage was a researcher for Ashland Oil. When his patent application was filed in 1971, Ashland was the manufacturer of Kelex 100 and Kelex 120, which were 8–hydroxy quinoline copper extraction reagents. Kelex 100, introduced in the late 1960's, was a strong extractant, and accordingly, was difficult to strip. The stripping problem was remedied by the introduction of Kelex 120 in about 1970. Kelex 120 was Kelex 100 plus nonyl phenol, the nonyl phenol having been added as a modifier to improve stripping.

Hartlage's patent limits its claims to the improvement embodied in Kelex 120, but the disclosure and teachings of its specification are not limited to adding nonyl phenol to hydroxy quinoline reagents. The Hartlage patent is directed generally to the solvent extraction process for recovery of copper, and specifically to a means for improving the stripping characteristics of copper extraction reagents. The means taught by Hartlage for improving the stripping characteristics is to form a mixture of the reagent with an alkyl phenol, preferably nonyl phenol. In this regard, Hartlage teaches that an advantage of adding nonyl phenol is "the unexpected ability thereof in promoting a substantial increase of stripping efficiency, thereby resulting in a corresponding increase in the overall metal extraction efficiency." Thus, Hartlage clearly discloses and specifically teaches that the use of nonyl phenol as a modifier will improve stripping of copper extraction reagents and, correspondingly, increase the "overall metal extraction efficiency" (i.e. net copper transfer efficiency) in solvent extraction processes.

The teaching of Hartlage as to the reagents with respect to which nonyl phenol will have its beneficial effect on stripping and net copper transfer efficiency is as follows:

As indicated hereinabove, the alkylated phenols useful in the practice of this invention are preferably used in conjunction with a metal ion collector of the type which forms a chelate with the metal ion in the extraction recovery process.

Hartlage defined the chelating reagents to which he was here referring as follows:

The most effective of this type of collector known presently are those compounds which contain either the 8–hydroxy quinoline structure or a hydroxy hydrocarbyl substituted oxime radical in the molecular configuration thereof. Of the latter, those compounds wherein the hydrocarbyl constituent is aromatic are proposed as being the more efficient collectors of this class.

Thus, Hartlage unequivocally teaches that his invention is applicable to the hydroxy aryl (aromatic) oximes as well as the hydroxy quinolines. Hartlage specifically refers to the LIX [R]64N-type benzophenone oximes as the commercially preferred examples of hydroxy aryl oximes since it was the only commercially accepted reagent at that time. However, both the strong salicylaldoximes and the strong benzophenone oximes are within Hartlage's definition of the oxime-type reagents to which his invention applies.

Hartlage also teaches the proportion of nonyl phenol to use. The proportions suggested by Hartlage cover the 1:1 and 1:3 ratios of oxime to nonyl phenol that constitute Acorga's P–5100 and P–5300 reagents, respectively. Hartlage also states that nonyl phenol is an especially preferred alkyl phenol "since it is readily available as a commercial product."

The examiner took note of these teachings of Hartlage and initially rejected the Dalton claim-in-suit on the ground that it was obvious from Hartlage. Thereafter,

ICI insisted, however, that Dalton's invention was not obvious on two grounds. First, it told the examiner that Hartlage's teachings, to the extent they went beyond suggesting the addition of nonyl phenol to hydroxy quinolines, were "speculative" and "prophetic". Second, ICI conducted experiments and submitted data tending to show that Hartlage had been wrong in teaching that the addition of nonyl phenol would improve the stripping and net transfer efficiency of all hydroxy aryl oxime. The file wrapper does not disclose whether the examiner accepted one or both of these contentions. It does, of course, disclose that he thereafter caused the patent to be issued. In doing so, he committed an error of law.

■ Section 103 provides that a patent may not be obtained if the subject matter sought to be patented "would have been obvious . . . [from the prior art] at the time the invention was made to a person having ordinary skill in the art." The touchstone of the test of the patentability under this section is thus what the person of ordinary skill in the art would have perceived from the existing prior art. This touchstone renders irrelevant the question of whether Hartlage was right or wrong about the effect of nonyl phenol on hydroxy aryl oximes as a class.

■ As the case law dealing with prior art which teaches away from the claimed invention establishes, Section 103's reference to prior art is not to that portion of the existing prior art which turns out to be sound teaching, but rather to *all* of the existing prior art, sound or unsound. This is significant in this case because neither the record before the patent office nor the record before me reveals any prior art reference which would cause an artisan of ordinary skill to question Hartlage's teaching that one should add nonyl phenol to hydroxy aryl oximes in order to improve their stripping and increase their copper transfer efficiency. ICI conducted experiments during the pendency of the patent prosecution which arguably indicated that nonyl phenol effected some hydroxy aryl oximes differently than others;[44] there is no reason to believe, however, that one of ordinary skill in the art, viewing the art as it existed in July of 1973, would have done anything other than that which Dalton in fact did, with the full expectation that it would improve the stripping and transfer efficiency of 5–nonyl–2–hydroxy benzaldoximes.

■ Focusing on the question of what one of ordinary skill would perceive from the existing prior art also helps to resolve the issue raised by ICI's contention that

**44.** Dalton's Rule 132 Declaration reported the following comparative loading and stripping data for four metal extractants with and without nonyl phenol, two of which were hydroxy aryl oximes and two of which were not:

| | Kelex 100 + | nonyl phenol | LIX 64N + | nonyl phenol | Pl Oxime + | nonyl phenol | L36 | + nonyl phenol |
|---|---|---|---|---|---|---|---|---|
| Copper in loaded organic phase (g. per litre) | 5.34 | 5.45 | 4.00 | 3.52 | 5.34 | 5.00 | 4.99 | 5.25 |
| Copper in stripped organic phase (g. per litre) | 3.08 | 1.45 | 0.28 | 0.14 | 3.40 | 2.26 | 2.38 | 3.06 |
| Copper transferred (g. per litre) | 2.26 | 4.00 | 3.72 | 3.38 | 1.94 | 2.74 | 2.61 | 2.19 |

Henkel has a different view of the significance on this data than ICI urged on the PTO. It correctly points out that this data and all other data in the record is consistent with the propositions that nonyl phenol improves the stripping and transfer efficiency of hydroxy aryl oximes which are strong enough to have a stripping problem. It is only with respect to weaker hydroxy aryl oximes which have no

Hartlage engaged in nothing more than speculation when he taught concerning hydroxy aryl oximes. While there is undoubtedly a distinction in the prior art context between "mere speculation" and a teaching which can form the basis of a Section 103 rejection, the distinction must be drawn on the basis of how the ordinary artisan of the day would interpret the disputed reference in light of the existing prior art as a whole, not upon the basis of whether the suggestion in the reference turns out to be correct or incorrect. As Judge Rich has observed, "Even if speculative, statements appearing in the prior art literature are good, for purposes of rejection under Section 103, for all they would fairly suggest to one of ordinary skill in the art." *Application of Oelrich*, 579 F.2d 86, 91 (CCPA 1978).[45]

Here there is nothing in the Hartlage patent or in the rest of the prior art which would suggest that Hartlage's teachings about hydroxy aryl oximes would be "ignored by those skilled in the art . . . as pure speculation." *Application of Ehrreich*, 590 F.2d 902, 910 (CCPA 1979). The only thing to which ICI can point in the prior art in this regard is that the examples of the Hartlage patent pertain only to the addition of nonyl phenol to hydroxy quinolines. This fact alone does not persuade me, however, that Hartlage's express and unqualified teaching regarding hydroxy aryl oximes would be disregarded or discounted in July of 1973 by prior art researchers.

This conclusion reached from examining the differences between the subject matter sought to be patented and the prior art is not in conflict with the secondary evidence in the case. Hartlage's teachings did not become public until the issuance of his pat-

ent in April of 1973. The three month gap between that time and the date of the claimed invention in July of 1973 is entirely consistent with the inference that the claim-in-suit is obvious from the prior art.

In summary, Dr. Dalton did precisely what Hartlage taught should be done, i.e. add nonyl phenol to hydroxy aryl oximes. Moreover, when Dalton did so, he found precisely the improved properties which Hartlage said would be obtained (i.e. improved stripping and increased copper transfer) and these properties are the only ones relied upon to support patentability. In these circumstances, a discovery otherwise unpatentable does not become patentable upon a showing that Dalton might have experienced a different result if he had added nonyl phenol to certain other hydroxy aryl oximes.

## VI. ALLEGED INEQUITABLE CONDUCT WITH RESPECT TO THE ACKERLEY AND MACK PATENTS.

### A. Failure to Disclose The Swanson Patent.

█ R. R. Swanson was employed by Henkel. His United States and United Kingdom prior art patents disclose a mixture of nonyl isomers as a solubilizing radical for benzophenone oximes. ICI failed to cite these patents, or any other prior art reference teaching the use of a mixture of nonyl isomers as a solubilizing radical, to the PTO during the prosecution of the Ackerley and Mack patent. This failure was not material, however, and was clearly not the result of an effort to gain advantage through deception.

---

stripping problems, like LIX 64N, that nonyl phenol provides no benefit.

**45.** ICI relies upon the *Oelrich* case, quoting the following language:
 If the affidavits are to be believed, then statements in the [prior art] Oelrich patent implying that a subcritical carrier frequently is feasible, albeit not "preferred", must be dismissed as speculation.
The affidavits here spoken of, however, were not reports of experiments conducted after the time of the alleged invention. They were affi-

davits of persons of ordinary skill in the art directed to the issues of (a) whether their peers, at the time of the alleged invention, would have read the Oelrich patent to suggest that a subcritical carrier frequency was feasible and (b) if so, whether they would have taken the suggestion seriously. Those affidavits showed persuasively that the answer to both questions was no. Here there is no dispute that Hartlage taught Dalton's discovery and there is no evidence suggesting a reason why he would not have been taken seriously.

It was obvious from Parrish, which was before the examiner, that one could use a mixture of nonyl isomers as a solubilizing radical for 2–hydroxy benzaldoximes. For this very reason the examiner found that the invention was *prima facie* obvious. ICI did not contest this finding; it argued patentability on the basis of surprisingly improved properties. The Swanson patent would not have assisted the examiner in resolving the issues raised by that argument.

B. *The Failure To Disclose The Compositions Of LIX* [R]*64 And LIX* [R]*64N And The DeMent And Merigold Paper.*

Henkel contends that ICI's argument for patentability would never have succeeded if it had told the examiner about the structures of LIX [R]64 and LIX [R]64N and had supplied him with a copy of the DeMent and Merigold paper. For reasons already discussed, I do not agree with this assertion and find no impropriety in ICI's failure to call the examiner's attention to these references even assuming that the structures of Henkel's reagents had been a part of the prior art.

C. *The ICI Affidavits.*

ICI submitted a number of affidavits to the PTO in support of its argument that the claimed invention was far superior to (a) Parrish's 5–octyl 2–hydroxy benzaldoxime compound in its solubility characteristics, in its rate of copper transfer, and in its phase separation, and (b) Parrish's 5–dodecyl 2–hydroxy benzaldoxime compound in its rate of transfer and phase separation.[46] These affidavits reported the results of experimentation designed to evaluate the solubility, speed, and separation characteristics of these three compounds. There is no allegation that the affidavits did not contain all pertinent results of that experimentation. Henkel, nevertheless, finds several faults with these documents.

First, it argues that ICI failed to tell the examiner that the octyl salicylaldoxime used in its testing had a single isomer chain.

While this is literally true, the affidavits expressly refer to the octyl compound as Parrish's octyl compound and, as noted above, the Parrish reference emphasizes that the octyl compound has a single isomer chain. Moreover, even if the affidavits had not contained a direct reference to Parrish, the allegedly concealed fact would have been obvious to the examiner from the context. ICI selected the closest, and only really pertinent, prior art for its testing program and the examiner would assume as much absent any indication to the contrary in the affidavits.

Henkel also claims that ICI wrongfully failed to explain to the examiner that the difference in solubility between Parrish's octyl compound and the claimed compound was attributable to the presence of a mixture of branched chain isomers in the latter compound. However, even assuming that ICI had a duty to explain, rather than simply to report, its observations, the alleged deficiency is not material. Henkel's contention that this explanation of the solubility differential was known in the art of the day is based on Parrish, and the examiner was fully familiar with that reference.

Additional background is necessary in order to evaluate Henkel's third challenge to ICI's affidavits. ICI found, as Parrish reported, that the Parrish octyl compound was not sufficiently soluble in the conventionally used kerosenes of low aromatic content, like Escaid, to permit efficient extraction. It was, however, more soluble in Aramasol [H], an aromatic solvent, and ICI measured its rate of extraction using that solvent. It also tested P–1, the claimed compound, as well as Parrish's dodecyl compound, in both Escaid and Aramasol [H]. All of the figures regarding the observed rates of extraction using various solvents are clearly reported in the affidavits. These figures indicated that which the affidavits expressly noted:

> kerosenes of the high aromatic content, like Aramasol, as contrasted with low ar-

---

**46.** PEX 635.

omatic kerosenes, like Escaid, have a depressing effect on rates of extraction.[47]

In a graph attached to the final affidavit as "Fig. 1," ICI compared the extraction rate of P–1 in Escaid, the solvent in which it performed best, with the extraction rate of Parrish's octyl compound in Aramasol [H], the only solvent tested in which it could be used commercially. The graph shows P–1 to be substantially superior. Figure 1 is followed by a graph comparing the extraction rates of P–1 and Parrish's dodecyl compound in Escaid and a graph showing the rates of the same compounds in Aramasol [H].

Henkel does not claim that Figures 1, 2 or 3 are misleading as far as they go. It faults ICI, however, for not including a fourth figure which would show the results for all three compounds in Aramasol [H] on one graph. Such a graph would have called the examiner's attention to the fact that, while P–1 was faster than the dodecyl compound in Aramasol [H], the octyl compound was faster than P–1. This, according to Henkel, would have demonstrated an inverse relationship between speed and the length of the chain and would have been highly material to the issue of predictability.[48]

The short answer to Henkel's argument is that all data about the speed of the three compounds in various solvents *were* reported to the examiner for his evaluation. In addition, however, the present record does not suggest that the inverse relationship which ICI supposedly should have highlighted was one known at the time of the invention or, indeed, that it exists. While the results of ICI's patent prosecution testing in Aramasol [H] happens to show a particular sequence with respect to speed, the record does not show that Henkel's inverse corrolation theory has general validity. Subsequent experimentation has shown, for example, that 5–octyl 2–hydroxy benzaldoxime, wherein the octyl is a mixture of

branched chain isomers, is somewhat slower than P–1.[49]

In any event, even assuming with hindsight that some other set of graphs would have presented the data more effectively, I certainly do not consider any deficiency in that regard to be clear and convincing proof of fraudulent intent or gross neglect on ICI's part.

Finally, I turn to Henkel's similar argument that ICI should have disclosed data gathered by Dr. Price in 1974 while experimenting with 5–heptyl 2–hydroxy benzaldoximes. On September 15, 1974, he reported to the workers in this section as follows: [50]

A study was . . . made of the rates at which the ligand solutions attained equilibrium for both the extraction and stripping processes. . . . Because the reactions were very fast under normal circumstances, conditions were chosen, e.g. lowering the stirring rate to 900 rpm, deliberately to slow down the reactions so that differences between the extractants would be more pronounced. In each case the approach to equilibrium was recorded after 30 seconds' agitation with results as follows:

| Ligand | Approach to Equilibrium after 30 seconds | |
| --- | --- | --- |
| | Loading | Stripping |
| L–62 Heptyl | 84.8% | 96.7% |
| P–1 Nonyl | 66.9% | 42.2% |
| L–68 Dodecyl | 47.0% | 32.0% |

Thus L–62 attains a very high approach to equilibrium in only 30 seconds for both the extractions and strip processes. By comparison L–68 is very slow and there is a clearly established order for the rates of extraction and stripping of L–62 P–1 L–68. . . .

Henkel concedes, of course, that Price's work is not prior art. It asserts, however, that ICI had an affirmative duty to disclose

---

**47.** PEX 635.

**48.** *See* DX 53.

**49.** PEX 734.

**50.** DX 322, p. 2. The circulation list on this document does not include anyone who submitted an affidavit in support of the Ackerley and Mack patent application.

it to the PTO because it was contemporaneously claiming before that office that one gets an unexpected increase in speed when one goes from $C_{12}$ to $C_9$. Henkel's argument mischaracterizes ICI's position before the PTO. Its affidavits can fairly be read only in the context of their purpose. The function of the affidavits submitted by ICI was to demonstrate that one of ordinary skill in the art at the time of the invention would not read the then existing art to suggest that one would get increased speed going from $C_{12}$ to $C_9$.[51] Dr. Price's data was neither a part of the prior art nor was it information regarding the properties of a compound disclosed in the prior art. Accordingly, it could not be material to the only issue before the PTO, i.e., would one of ordinary skill in the art who studied the art in existence in March 1973 be surprised by ICI's accomplishments. Finally, even assuming that evidence of post-invention experimentation were relevant, as earlier noted, it is far from clear that speed consistently improves as the carbon chain is shortened.

In summary, ICI's testing compared the properties of the claimed composition with those of the closest compositions described in the prior art and its affidavits disclosed all of its pertinent results to the PTO. I find no substantial fault with its performance.[52]

### VII. ALLEGED INEQUITABLE CONDUCT WITH RESPECT TO THE DALTON PATENT.

#### A. *Failure To Cite The Hartlage Patent.*

■ While it is true that ICI knew of the Hartlage patent before it filed the Dalton application and failed to bring that patent to the attention of the examiner, I am satisfied by Mr. Huggill's testimony that this failure was inadvertent. More-

over, we know that the Hartlage patent was in fact considered extensively by the examiner and, accordingly, that there was no causal connection between ICI's failure to bring it to his attention and the issuance of the Dalton patent. *Cosden Oil & Chemical Company v. American Hoechst Corporation, supra.* Under these circumstances, ICI's conduct with respect to the Hartlage patent affords no defense for Henkel.

#### B. *Failure To Disclose The Ritcey Paper.*

A prior art paper by G. M. Ritcey, compared nonyl phenol and isodecanol as stripping modifiers for hydroxy quinolines and reported that nonyl phenol was better for stripping. Henkel urges that Ritcey's work, if disclosed to the PTO, would have contradicted an argument made by ICI about the effects of isodecanol on P–1.

It is true, as Henkel states, that ICI pointed out to the examiner that Ackerley and Mack did not suggest that aliphatic alcohols are equivalent to nonyl phenol for applicant's purposes. But Henkel's argument omits the fact that the very next sentence in ICI's affidavit states:

> Very recent work by applicant gives some indication that isodecanol might in some cases give a stripping effect similar to that of nonyl phenol. However, the alcohol has other disadvantages which apparently would preclude its practical utility.

Thus, contrary to Henkel's argument, ICI did not rely on the argument that isodecanol would not produce an effect similar to nonyl phenol. ICI merely pointed out, in reply to a comment by the examiner, that the Ackerley and Mack patent, which discloses possible use of isodecanol, did not disclose that similarity. That was a true statement.

---

**51.** This is the only relevant purpose they could serve. *Application of Oelrich,* 579 F.2d 86, 91 (CCPA 1978).

**52.** Henkel also criticizes the manner in which ICI's testing was done. It has failed to present clear and convincing evidence, however, that the alleged deficiencies materially affected the

reported results. In addition, Henkel successfully resisted discovery in this action on the ground that it did not challenge the validity of ICI's test results and, indeed, reiterated that position during trial. It should not be permitted to reverse its position in post-trial briefing.

Henkel also points to Ritcey's disclosure of the use of isodecanol with the Kelex reagents. But Hartlage also disclosed the use of isodecanol with Kelex; to the extent that isodecanol was relevant at all, the Ackerley and Mack patent was far more pertinent than either Hartlage or Ritcey because it suggested the use of isodecanol with P–1.

C. *The Failure To Test 5–Nonyl–2–Hydroxy Benzophenone Oxime Plus Nonyl Phenol Under Ammoniacal Conditions.*

As earlier noted, ICI argued patentability over Hartlage primarily on the ground that Hartlage's teachings were not universally true and, accordingly, that the effect of adding nonyl phenol to hydroxy aryl oximes was unpredictable. In support of this argument, ICI emphasized Example 3 of the patent which showed that when nonyl phenol was added to 5–nonyl–2–hydroxy benzophenone oxime and used in acidic conditions, stripping was improved but extraction was decreased to a point where the net copper transfer declined.

Henkel contends that ICI, as a result of its reliance on Example 3, became obligated to test the benzophenone oxime compound with and without nonyl phenol under conditions of *ammoniacal* loading. In connection with this argument it tendered the results of its experts' testing showing that under ammoniacal loading conditions the addition of nonyl phenol to 5–nonyl–2–hydroxy benzophenone oxime improves net transfer efficiency by forty percent. These results are, of course, consistent with the teachings of Hartlage.

 Henkel's argument is unpersuasive. One who submits test results to the PTO tending to show that a prior art suggestion is not universally valid has no duty to undertake testing to explore all possible applications of the prior art suggestion. Here ICI's testing did in fact tend to show that Hartlage's suggestion with respect to a hydroxy aryl oxime was not universally true.

Its duty of candor did not require that it test the other hydroxy aryl oximes under all possible conditions.

## VIII. INFRINGEMENT.

 Henkel's reagents clearly come within the scope of the Ackerley and Mack patent. There can be no dispute that the 5–nonyl–2–hydroxy benzaldoxime specified in Claim 1 of Ackerley and Mack is an essential component of Henkel's LIX [R]605 (with nonyl phenol added) and Henkel's LIX [R]617 (with tridecanol added).[53] Henkel nevertheless asserts that there has been no infringement because its activities with these reagents have been "experimental". I disagree. Henkel's manufacture of LIX [R] 605 and LIX [R]617 constitutes infringement.

Henkel has made 1200 pounds of LIX [R] 605 for pilot plant use. In addition, it has supplied samples of LIX [R]605 and LIX [R]617 to several potential customers and has made it known in the market that they are commercially available. In particular, Henkel has attempted to compete with ICI by offering these reagents for sale in bids to Kennecott and Inspiration Mines. In this context, Henkel's activities cannot fairly be denominated experimental. It has clearly passed the point of making these reagents solely for the purpose of obtaining information about them. Its manufacturing activities have been for the purpose of supplying them to potential customers in the hope of obtaining orders for commercial quantities. In short, Henkel is not experimenting with LIX [R]605 and LIX [R]617; it is competing in the marketplace with them. Its manufacture of them for this purpose was an infringing act. Chisum, *Patents*, § 16.03[1].

 Henkel also claims that it has not infringed because its manufacture of these reagents was *de minimis*. Manufacture of even one infringing product is generally sufficient to constitute infringement. *Neff Inst. Corp. v. Cohu Electric, Inc.*, 269

---

**53.** In addition, LIX [R]605, in combining 5–nonyl–2–hydroxy benzaldoxime with nonyl phenol, precisely follows the teaching of the Dalton patent. Since I have found Dalton invalid, however, there can be no infringement. Even if Dalton were assumed valid, there would be no infringement because Dalton is a process patent issued in March 1979, and Henkel has not been shown to have used LIX [R]605 in any solvent extraction process since that time.

F.2d 668, 673 (9th Cir. 1959). Accordingly, in order to establish a *de minimis* defense, courts have required not only that the manufacture or sale be insignificant in amount, but also that the alleged infringing activity have been terminated at the *de minimis* stage. *Warner & Swasey Co. v. Held*, 256 F.Supp. 303, 313 (E.D.Wis.1966). *See also, Knapp Monarch Co. v. Casco Products Corp.*, 342 F.2d 622 (7th Cir. 1965) (defendant was a sales representative who had terminated relationship with supplier of infringing product); *Airtex Corp. v. Shelley Radiant Ceiling Co.*, 400 F.Supp. 170 (N.D. Ill.1975) (patent had expired making further infringement impossible). Even assuming that the quantities of the infringing products manufactured in this case are properly characterized as insignificant, the circumstances do not provide assurance that Henkel's manufacturing activities will cease absent judicial intervention.

Having determined that Henkel has infringed the Ackerley and Mack patent, ICI's contention that this infringement was willful must also be examined. It is clear, both from the exact precision with which Henkel's compounds copied ICI's 5–nonyl–2–hydroxy benzaldoxime and from Henkel's own documents, that Henkel knew that it was infringing ICI's patents, if valid. Henkel claims, however, that it proceeded to make its reagents because it had an honest belief that ICI's patents were invalid.

Before making the final decision to go ahead with LIX ᴿ605 and LIX ᴿ617, Henkel secured an opinion from outside counsel regarding the validity of the Ackerley and Mack patent. That opinion, after a careful analysis of the facts and the law, concluded that Ackerley and Mack was invalid. It is not suggested that Henkel withheld or distorted material information in seeking this opinion or that the opinion was not rendered by counsel in good faith. While the conclusion reached is inconsistent with the findings of this Court, it is a tenable one on an issue which could be (and was, I believe) litigated in good faith.

While seeking the advice of competent outside counsel is not dispositive on the issue of willfulness, it can be highly relevant evidence on that issue. *W. L. Gore & Assoc. v. Carlisle Corp.*, 381 F.Supp. 680 (D.Del.1974). In this case, it is by far the most probative evidence on the issue of willful infringement. Based on all the evidence, I am persuaded that Henkel in fact relied upon the opinion of outside counsel and that it was not unreasonable in doing so. Accordingly, I conclude that Henkel believed in good faith that ICI was not entitled to a legal monopoly. For this reason, a finding of willful infringement is not appropriate. *Hadco Products Inc. v. Lighting Corporation of America, Inc.*, 312 F.Supp. 1173, 1186 (E.D.Pa.1970).

Having found no willful infringement, I conclude that this is not an "exceptional" case justifying the award of attorney's fees under 35 U.S.C. § 285.

### IX. CONCLUSION.

The Ackerley and Mack patent is valid, enforceable and infringed. The infringement was not willful, however, and this is not an "exceptional" case within the meaning of 35 U.S.C. § 285. The Dalton patent, on the other hand, is invalid because the claimed invention would have been obvious to a contemporaneous artisan of ordinary skill from the teachings of the Hartlage patent.

SUBMIT ORDER.

### SUPPLEMENTAL OPINION

Henkel has moved for reconsideration and reargument based upon the statement in my earlier Opinion that "Henkel does not dispute that Ackerley and Mack's 5–nonyl–2–hydroxy benzaldoxime has substantially faster kinetics and better phase separation than Parrish's ... 5–octyl 2–hydroxy benzaldoxime." Henkel protests that it does dispute this proposition and that this fact is apparent from its contention, in the context of its fraud on the patent office claims, that kinetics and separation improve as the number of carbon atoms in the aliphatic "tail" is reduced. While there is a sense in which

the challenged statement can be said to mischaracterize Henkel's position, I did not misunderstand that position and Henkel's motion must be denied.

Ackerley and Mack claimed to have discovered a reagent which was capable of extracting copper from low pH and high concentration leach solutions and which was characterized by high solubility, rapid kinetics, and excellent phase separation. The patent office found the claimed invention to be prima facie obvious but, on the basis of ICI's test data, concluded both that the combined properties of Ackerley and Mack's reagent were such as to make it far superior to any prior art reagent for extraction in low pH or high concentration solutions and that one of ordinary skill in the prior art would not have expected to achieve this superiority by employing 5–nonyl–2–hydroxy benzaldoxime. The patent office issued the patent-in-suit on the basis of those conclusions and that patent must be presumed to be valid in the absence of a showing that those conclusions are erroneous. 35 U.S.C. § 282. As indicated in the original Opinion, Henkel has not made such a showing.

Henkel cannot, and does not, contend that one can achieve the same or better solubility, speed and separation with Parrish's prior art 5–octyl compound as with Ackerley and Mack's 5–nonyl compound. Parrish's single isomer 5–octyl compound has poor solubility and cannot achieve anywhere near the same speed and separation which can be achieved with the patented invention solubilized, for example, in Escaid 100. All that Henkel can claim is that there is one solvent, Aramasol [H], in which Parrish's 5–octyl compound performs as well as Ackerley and Mack's reagent. This fact, which as earlier noted was before the patent office, is simply irrelevant, however. While it is true that Parrish's 5–octyl compound is more soluble in Aramasol [H] than other commercially feasible solvents, that compound in that solvent cannot

achieve the speed and separation result attainable with the 5–nonyl compound in the most prevalent commercial solvents.

The combined properties of the patented compound, taken as a whole, make it substantially better than prior art reagents. While I have previously found that one of ordinary skill in the art, based on that art, would have expected to find the increased solubility which Ackerley and Mack in fact found using 5–nonyl–2–hydroxy benzaldoxime, nothing in the prior art suggests that this artisan would have expected to achieve *excellent solubility, speed and separation,* along with acceptable strength, selectivity, stability and synthesis.* It follows that the Ackerley and Mack patent meets the patentability standard of 35 U.S.C. § 103.

---

* As noted in my Opinion, the progression which Henkel relies upon in connection with its fraud on the patent office claims has not been shown to exist. More important for present purposes, however, that alleged progression was not taught in the prior art.